UNION CARBIDE CORPORATION, individually and on behalf of and as the successor in interest of Seadrift Polypropylene Company, Plaintiff,

v.

MONTELL N.V.; Montell Polyolefins; Montell North America Incorporated; Montell USA Incorporated; Technipol S.r.l.; Montedison S.p.A.; Montell Finance USA, Inc.; Royal Dutch Petroleum Company, p.l.c.; The Shell Transport and Trading Company, p.l.c.; Shell Petroleum N.V.; The Shell Petroleum Company Limited; Shell Petroleum Inc.; Shell Oil Company; Shell Polypropylene Company; Shell Canada Limited; Shell International Chemical Company Limited; and Shell Internationale Research Maatschappij B.V., Defendants.

No. 95 Civ. 0134(SAS).

United States District Court, S.D. New York.

Aug. 4, 1998.

John A. Herfort, Gibson, Dunn & Crutcher LLP, New York City, for Plaintiff.

William C. Pelster, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, Scot B. Hutchins, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C., Robert G. Stachler, Taft, Stettinius & Hollister LLP, Cincinatti, OH, for Defendants.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Union Carbide Corporation ("UCC") filed a Fourth Amended Complaint on September 24, 1996, asserting a variety of tort, contract and antitrust claims arising out of its business dealings with defendant Shell Oil Company ("SOC") in the 1980's and early 1990's. On May 27, 1998, defendants made seven separate motions seeking summary judgment on ten of UCC's claims. Three of these motions were referred to Special Master Bernard S. Black for a report and recommendation ("the Report"). The Report was submitted on June 23, 1998. On August 3, 1998, UCC and the Shell defendants settled their portion of the case, and thus rendered moot the Shell/Montell motion. This Opinion reviews *de novo* those portions of the Report not rendered moot by the partial settlement.

### I. Factual Summary

The facts of this case were described at some length both by the Court in two of its prior opinions in this case and by the Special Master. *See Union Carbide Corp. v. Montell N.V.,* 95 Civ. 0134, slip op. at 2–5 (S.D.N.Y. July 2, 1998); *Union Carbide Corp. v. Montell N.V.,* 95 Civ. 0134, slip op. at 2–12 (S.D.N.Y. June 3, 1998); Report at 4–15. These facts will therefore not be repeated here, except to the extent necessary to understand my review of the Report.

## II. Summary Judgment Standard

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 542 (2d Cir.1993). Once this burden is met, the nonmovant must produce evidence from which a rational jury could find in its favor. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir.1997). In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See id.*

■ Antitrust claims typically arise out of complex factual situations that support a wide variety of possible inferences; summary judgment on such claims may therefore be difficult to obtain. *See Capital Imaging*, 996 F.2d at 541. However, because of the potential chilling effect of prolonged antitrust litigation on competition, parties that forward economically implausible antitrust claims "must come forward with more persuasive evidence to support [their] claim[s] than would otherwise be necessary" to survive summary judgment. *R.B. Ventures*, 112 F.3d at 58 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55 (2d Cir.1997) (" '[I]n the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the nonmoving party must set forth facts that tend to preclude an inference of permissible conduct.' ") (quoting *Capital Imaging*, 996 F.2d at 542)). Nevertheless, a court considering a motion for summary judgment on an antitrust claim may not weigh the evidence presented as if it were the trier of fact: Even when a plaintiff's claim is implausible, summary judgment may not be granted if "reasonable minds could differ as to the import of the evidence." *R.B. Ventures*, 112 F.3d at 58–59 (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988)).

## III. Discussion

### A. Montedison's Motion for Summary Judgment on Claim III

■ Montedison first moves for summary judgment on UCC's third claim for relief, which alleges a violation of Section 1 of the Sherman Act in the polypropylene resin market. This section makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. To prevail on a Section 1 claim, a plaintiff must show "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) [that] such combination constituted an unreasonable restraint of trade either per se or under the rule of reason." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95–96 (2d Cir. 1998).

### a. Proof of Conspiracy

■ Montedison challenges the sufficiency of UCC's proof on the first prong of this test. I agree with the Special Master that UCC has produced evidence from which a rational juror could find that Shell and Montedison's agreement to pursue the formation of Montell included an agreement to limit output in the polypropylene resin market by ending Nautilus negotiations. For instance, one contemporaneous Montedison memo reports that "[a]s a result [of the Sophia negotiations], Shell blocked all relations with UCC, with whom they were negotiating a JV [i.e. Nautilus] in the US...." Plaintiff Union Carbide Corporation's Response to Defendant's Joint Statement of Material Facts Pursuant to Local Rule 56.1 in Support of Their Motions for Summary Judgment ("Pl's 56.1 Response") at ¶ 144(b). Notes from a Project Sophia meeting further illustrate the

causal connection between the Sophia negotiations and the end of Nautilus: "Shell (was) talking to UCC to expand PP in USA....," but "they could stop contacts with [UCC] for (Unipol) expansion of their PP interests in US." Defendants' Joint Statement of Material Facts Pursuant to Local Rule 56.1 In Support of Their Motions for Summary Judgment, Ex. 106. The real question, therefore, is not whether this agreement existed, but whether it amounted to an "unreasonable restraint of trade" within the meaning of the Sherman Act.

### b. Was Termination of Nautilus an Ancillary Restraint?

■ As noted above, a plaintiff can demonstrate the unreasonableness of a restraint on trade under either a "per se" or "rule of reason" theory. Per se analysis, however, is inappropriate in cases where the "challenged conduct is subservient or ancillary to a transaction which is itself legitimate." *See United States v. Columbia Pictures Corp.,* 189 F.Supp. 153, 177 (S.D.N.Y.1960). The Special Master correctly determined that the conduct challenged here—the Shell/Montedison agreement to end the Nautilus negotiations—was ancillary to the formation of Montell. UCC resists this conclusion on two grounds. First, it contends that the decision to terminate Nautilus was not a necessary consequence of the decision to pursue Montell and was therefore not an "ancillary" agreement. UCC has previously stated, however, that "[a]ll the parties were well aware of the fact that for SOC to join [Montell], SOC would have to stop its expansion plans with UCC and terminate its relationship with UCC." UCC's 56.1 Response at ¶ 144(e). In light of this admission, its half-hearted, eleventh-hour change of position is unpersuasive.

Second, UCC argues that the ancillary restraints doctrine does not apply because the formation of Montell was not "lawful." The deal's unlawful nature, it contends, is demonstrated by the fact that it received only conditional approval from antitrust regulators. Suffice it to say that UCC cites no authority that provides an iota of support for this argument. *See Blackburn v. Sweeney,* 53 F.3d 825, 828 (7th Cir.1995) (ancillary restraint doctrine not applicable to competition-restricting agreement when such agreement was not a necessary component of legitimate partnership dissolution contract); *General Leaseways v. National Truck Leasing Ass'n,* 744 F.2d 588, 595 (7th Cir.1984) (ancillary restraint doctrine not applicable to competition-restricting agreement when such agreement was not a necessary component of a legitimate reciprocal-service arrangement).

### c. Rule of Reason

■ The fact that an agreement may be considered ancillary to a legitimate one, however, does not end the inquiry. Even an ancillary restraint may violate the Sherman Act if it fails to satisfy the "rule of reason" test. *See Brown v. Pro Football, Inc.,* 50 F.3d 1041, 1056 (D.C.Cir.1995). In the Second Circuit, the first step in a rule of reason analysis is an examination of a defendant's market power, *see Capital Imaging,* 996 F.2d at 546 ("[M]arket power ... [is] a highly relevant factor in rule of reason analysis."), the presence of which is often, though not always, determined with reference to its market share. *See K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir.1995) ("[M]arket share may be used as a proxy for market power.").

Here, UCC's expert estimated Himont/Montell's share of the North American polypropylene resin market to have been 27.6% in 1990 and 22.9% in 1995. *See* Expert Report of Dr. Andrew Joskow ("Joskow Rep."), Exhibits Cited in Plaintiff Union Carbide Corporation's Statement of Material Facts as to Which There is a Genuine Dispute Pursuant to Local Rule 56.1 ("UCC's 56.1") at Ex. 6. Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power. *See Jefferson Parish Hospital Dist. v. Hyde,* 466 U.S. 2, 27, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (firm with 30% market share lacks "dominant market position"); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 517 (3rd Cir. 1998) ("[S]ince *Jefferson Parish,* no court has inferred substantial market power from a market share below 30%."); *Valley Products*

*v. Landmark,* 128 F.3d 398, 402 n. 3 (6th Cir.1997) ("[C]ourts hav[e] repeatedly held that a 30% market share is insufficient to confer ... market power...."). *Cf. Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F.Supp. 617, 658 (E.D.Pa.1997) (summary judgment denied where defendant had 31% market share and this market share was increasing despite defendant's supracompetitive prices).

Market power may also be shown by evidence of "specific conduct indicating the defendant's power to control prices or exclude competition." *K.M.B. Warehouse,* 61 F.3d at 129 (quoting *Broadway Delivery Corp. v. United Parcel Serv.,* 651 F.2d 122, 126–27 (2d Cir.1981)). As the Report points out, there is evidence in the record suggesting that the termination of Nautilus led to an increase in polypropylene prices in 1994 and 1995. *See* Expert Report of Benjamin Klein, UCC 56.1 at Ex. 4 ¶ 82. However, UCC cannot show that this increase was the product of "control" exerted by Shell or Montedison: It is undisputed that numerous competitors could have increased production in 1994 and 1995 but chose not to do so. *See* Joskow Rep. at Ex. 9. While polypropylene prices did increase over those two years, no rational juror could find that this was the result of market power exercised by Shell or Montedison.[1]

As UCC points out, a showing of market power is not an absolute requirement in a Section 1 case. In some circumstances, at least, other proof of an "actual adverse effect on competition" may suffice. *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 461, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). This standard is a difficult one for UCC to meet, however: The Court's research has failed to uncover any case in which an actual adverse effect on competition

was found in the absence of (1) market power or, at least, high market share *and* (2) conduct that was either per se illegal or close to it. *See id.* at 458–61, 106 S.Ct. 2009 (members of defendant organization constituted "heavy majorities" of practicing dentists in the relevant market; members had engaged in a group boycott); *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. 85, 99, 110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (defendant had market power; members had engaged in a horizontal restriction on price and output, "perhaps the paradigm of an unreasonable restraint on trade"); *Wilk v. American Med. Ass'n,* 895 F.2d 352, 360, 359–60 (7th Cir.1990) (defendant had market power; members had engaged in a group boycott); *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1442, 1446–47 (9th Cir.1988) (defendant had 84% of relevant market share; co-defendants had engaged in a group boycott); *see also E.W. French & Sons, Inc. v. General Portland Inc.,* 885 F.2d 1392, 1403 (9th Cir.1989) (concurring opinion) (evidence suggests defendants had market power and engaged in a price-fixing conspiracy; cases in which a plaintiff can recover solely on price increases or output reduction to establish actual adverse effect on competition "doubtless ... will be rare"). Thus, the "actual adverse effect" test is not intended to radically lower the burden of proof in Section 1 cases, but rather to provide a "safety valve" to cover situations in which a plaintiff fails to meet either the market power or the per se conduct test, but comes close to meeting both.

Clearly, this is not such a situation. UCC can show neither market power, high market share, nor conduct even arguably approaching per se illegality. Moreover, its theory of competitive injury is rather far fetched.[2] In

---

1. UCC also points to an FTC document that describes the polypropylene resin market as one characterized by high barriers to entry. UCC pointedly fails to object, however, to the Report's assertion that there is no evidence to suggest that the firms already participating in the polypropylene market faced any significant barriers to expansion. *See* Report at 53.

2. UCC argues that
   [d]efendants, like other industry participants, were well aware that North American [poly-

propylene] capacity utilization—and [polypropylene] prices and profits—were projected to rise with growing demand in the mid 1990s when the Nautilus capacity was scheduled to come on stream, that significant additional Nautilus capacity would depress industry [polypropylene] prices and profits, and that most [polypropylene] producers would not authorize the construction of new capacity during the bottom of an industry cycle when prices and capacity utilization were low (as they were in the early 1990s).

these circumstances, an expansive application of the "actual adverse effect" rule is not warranted. I therefore conclude that UCC has failed to proffer evidence that would support a rational jury verdict in its favor on this claim.[3]

**B. Interpretation of Claim V**

Though Montedison did not move for summary judgment on UCC's Claims IV or V, one issue regarding Claim V must be addressed here. The Special Master recommends that I interpret that claim to allege a unilateral attempt to monopolize by Montedison as well as a conspiracy to monopolize by Montedison and Shell. *See* Report at 32. As Montedison points out, the claim is phrased generally and, standing alone, makes no specific allegations concerning a unilateral attempt to monopolize by any defendant. *See* Complaint at ¶¶ 238–43. However, it does incorporate by reference other parts of the Complaint, some of which make allegations suggesting that Montedison attempted unilaterally to monopolize the Total Package License market. *See, e.g.,* Complaint at ¶ 105 ("Montedison concluded that the UCC/Venture was the only competitor in a position to be a serious threat to its dominance in the licensing of polypropylene technology...."); *id.* at ¶ 106 ("Montedison sought to break apart the UCC/Shell Venture by inducing UCC to align with Montedison. After UCC rejected Montedison's ap-

proach ... Montedison ... contacted RDS and Shell and proposed combining their respective polyolefins businesses into a worldwide venture...."). From these allegations, a party as sophisticated as Montedison could have inferred that it was accused of both joint and unilateral conduct. I am cognizant of the fact that the Complaint's lack of clarity may have affected Montedison's ability to move for summary judgment on this component of UCC's claim. In light of the fact that the evidence supporting it will be largely redundant of the evidence on the conspiracy to monopolize theory, however, Montedison will not be unduly prejudiced if any summary judgment motion it may make is decided concurrently with a motion for a directed verdict at the close of UCC's case. I therefore accept the Special Master's recommendation on this issue.

**C. Montedison's Motion for Summary Judgment on Claim VI**

Montedison also moves for summary judgment on UCC's Claim VI, which alleges that the RDS Group, Shell Transport, Montedison and Montell N.V. violated Section 7 of the Clayton Act with regard to the Total Package License and Catalyst markets. Having reviewed the record and the parties' briefs, and having received no objections to the Report, I accept the recommendation of the Special Master: Summary judgment is

---

UCC's Objections to Special Master Black's Report and Recommendation at 5 n. 5. This theory assumes irrational behavior on the part of other market participants: If it was known that polypropylene resin profits were to rise in the mid 1990s, each resin producer—absent an industry-wide conspiracy—would have had a powerful incentive to expand production in order to capture some of those profits. Because UCC's claim of harm to competition depends, at least in part, on this dubious theory, it faces a mildly heightened evidentiary burden at the summary judgment stage. *See R .B. Ventures,* 112 F.3d at 58; *see also Capital Imaging,* 996 F.2d at 546 ("[F]irms lacking substantial market power act against their own self-interest when they raise prices, reduce output, or otherwise restrain trade. The marketplace itself will discipline such misguided efforts as buyers switch to substitutes or new sources of supply enter the market.").

**3.** UCC also argues that the damages it seeks on Claim III—damages intended to compensate it

for injury to its polypropylene resin business—may be recoverable under one of its other antitrust claims, given the interrelatedness of the Total Package License and polypropylene resin markets. It would be premature to decide this issue now: The parties did not address it at all in their motion papers and only discussed it briefly in their responses to the Report. UCC may be able to prove that at least some portion of the damage to its polypropylene resin business was caused by Montedison's alleged anticompetitive behavior in the separate, but related, Total Package License market. *See Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1222 (9th Cir.1997). If UCC fails to proffer sufficient proof to justify a finding that some of the damages to this business were caused by Montedison's alleged conspiracy to monopolize, attempt to monopolize and/or restraint of trade in the Total Package License market, then Montedison's motion for judgment as a matter of law on this issue at the close of plaintiff's case will be granted.

granted for all defendants on Claim VI, but only insofar as it alleges acts prior to the formation of Montell.[4]

## IV. Conclusion

For the above stated reasons, I hereby accept and adopt the Report insofar as it recommends that: 1) summary judgment be granted for Montedison on Claim III of the Complaint; 2) partial summary judgment be granted on Claim VI; 3) Claim V be interpreted to include both a claim for conspiracy to monopolize by Shell and Montedison and a claim for unilateral attempt to monopolize by Montedison. However, I reject the Report's recommendation that the jury be instructed that, as a matter of law, UCC has demonstrated the existence of a conspiracy between Shell and Montedison.

---

4. Finally, I reject the Special Master's recommendation that the jury be instructed that there is no genuine dispute as to the existence of a conspiracy between Shell and Montedison. *See* Report at 61. For one thing, UCC has not moved for summary judgment. For another, as Shell points out, the word "conspiracy" generally connotes an illegal agreement. The parties here do not dispute that Shell and Montedison reached an agreement regarding Montell. The legality of that agreement, however, is hotly disputed.