UNION CARBIDE CORPORATION,
Plaintiff,

v.

MONTELL N.V.; Montell Polyolefins; Montell North America Incorporated; Montell USA Incorporated; Technipol S.r.l.; Montedison S.p.A.; Montedison U.S.A., Inc., Defendants.

No. 95 Civ. 0134(SAS).

United States District Court,
S.D. New York.

Nov. 11, 1998.

John J. Swenson, Michael L. Denger, Mark E. Weber, Steven E. Sletten, Kay Kochenderfer, M. Sean Royall, Richard J. Doren, Gibson, Dunn & Crutcher L.L.P., New York City, for Plaintiff.

Robert S. Bennett, Skadden, Arps, Slate, Meagher & Flom L.L.P., Washington, DC, William Pelster, Shepard Goldfein, Peter Greene, James A. Keyte, Amy R. Sabrin, Skadden, Arps, Slate, Meagher & Flom L.L.P., New York City, Philip Korologos, Boies & Schiller L.L.P., New York City, L. Clifford Craig, Taft, Stettinius & Hollister, L.L.P., Cincinnati, OH, Jeffrey A. Potts, Smyser, Kaplan & Veselka LLP, Houston, TX, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

The parties have moved *in limine* pursuant to Rule 16(c)(3) and (4) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") to preclude the admission of certain evidence. Thirty separate motions were fully submitted on October 26, 1998. Eight of those motions were referred to Magistrate Judge Michael Dolinger for a report and recommendation. The parties also addressed the question of whether the liability and damages issues should be tried separately. Oral argument was held on November 2 through 5, 1998. The following constitutes the Court's rulings on the bifurcation question and on sixteen of the motions *in limine* (fourteen are decided and two have been deferred). The remainder of the motions will be addressed in separate orders. The facts of this case have been described in some detail in previous opinions and will not be repeated here.[1]

### I. Bifurcation of Liability and Damages

■ Prior to argument on the motions, the parties discussed the possibility of bifurcating the trial by trying the liability issues before reaching the issue of damages. *See*

---

1. *See Union Carbide v. Montell N.V.*, 95 Civ. 0134, 1998 WL 474207, *1–2 (S.D.N.Y. Aug.12, 1998); *Union Carbide Corp. v. Montell N.V.*, 9 F.Supp.2d 405, 407–408 (S.D.N.Y. July 2, 1998); *Union Carbide Corp. v. Montell N.V.*, 95 Civ. 0134, 1998 WL 293991, *1–5 (S.D.N.Y. June 5, 1998); *Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1125–1131 (S.D.N.Y.1996). *See also* Report and Recommendation of Special Master Bernard S. Black, on Defendants' Motions for Summary Judgment, submitted June 23, 1998.

Transcript of Oral Argument, November 3, 1998 ("Nov. 3, 1998 Tr."), at 3–15. A court may order a separate trial of any issue to avoid prejudice and promote judicial efficiency. *See* Fed.R.Civ.P. 42(b); *see also Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996). Bifurcation may be appropriate where the evidence offered on two different issues will be wholly distinct, *see, e.g., Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.1984) (affirming bifurcation "because the two phases involved different types of evidence"), or where litigation of one issue may obviate the need to try another issue, *Morse/Diesel, Inc. v. Fidelity and Deposit Co.*, 763 F.Supp. 28, 35 (S.D.N.Y.), modified in part on other grounds, 768 F.Supp. 115 (S.D.N.Y.1991), aff'd by summary order, 1996 WL 481813 (2d Cir. Aug.22, 1996).

▮▮▮▮ The question of whether to bifurcate a trial into liability and damages phases is committed to the sound discretion of the trial court. *See Getty Petroleum Corp. v. Island Transportation Corp.*, 862 F.2d 10, 15 (2d Cir.1988); *see also* 3 *Moore's Federal Practice,* § 16.77[4][a][iv] (Matthew Bender 3d ed.). When determining bifurcation issues, judges consider the following factors:

[1] The likelihood that bifurcation, or the failure to bifurcate, would result in risk of substantive prejudice, such as the jury not deciding any aspect of the case strictly on the merits of the evidence.

[2] The likelihood that bifurcation would enhance juror comprehension of the issues presented in the case.

[3] The likelihood that significant resources would be saved by bifurcation.

[4] The likelihood that significant resources would be wasted by bifurcation, as a result of having to repeat presentation in two proceedings of the same evidence.

[5] The potential that, after bifurcation and trial, the remaining issues might be resolved by motion or settlement.

[6] The fact that the case involves a class action or mass tort case involving many plaintiffs.

*Id.* at 184–85. Several of these considerations favor the bifurcation of liability and damages in this case.

First, bifurcation would enhance the jury's understanding of the issues in this complex case. The Court's Order Regarding Pre-Trial Schedules and Conduct of the Trial of September 11, 1998, directs that the trial is to last no more than eight weeks. Not only does the trial promise to be lengthy, but also complex. The case involves the obscure and highly technical field of technology licensing, as well as concepts of market share, competition and attempted monopolization. Jurors will be asked to evaluate the facts with regard to three antitrust claims and one state law claim of tortious interference with an existing contractual relationship. Both the liability and the damages issues presented by such claims involve voluminous evidence and difficult concepts lying at the crossroads of law and economics. The jury will be required to learn entirely new vocabularies in areas in which they are likely to be totally inexperienced. Segmenting difficult issues of liability and damages might enhance juror comprehension. Confronting one complex set of issues at a time is likely to reduce the possibility of jury frustration and confusion.

There is little likelihood of repetition or waste of resources because the damages issues do not appear to be inextricably interwoven with the liability issues or to require repetition of the evidence presented during the liability phase. The parties intend to call only a few witness in the damages phase. Plaintiff intends to rely primarily on its damages expert, Dr. Jeffrey J. Leitzinger; Defendants, in turn, will rely on their expert, Professor Sharon M. Oster. Both sides agreed that there may be a few additional brief witnesses during the damages phase. *See* Nov. 3, 1998 Tr. at 8–9. The parties agreed that the liability phase would last approximately seven weeks, and could be followed immediately, before the same jury, by a one-week trial on damages. *See id.* at 11–12.

Of course, if the jury concludes that Defendants have no liability, there would be no need to try damages. Finally, those motions in limine directed solely toward damages

(Plaintiff's Motions 15 and 17) need not be decided prior to the damage phase, thereby decreasing the Court's burden.[2] As a result, any measure that reduces the Court's burden is viewed favorably.

The arguments against bifurcation are less compelling. In candor, I do not believe that a plaintiff's liability verdict will result in settlement, given the significant legal issues that exist in connection with the calculation of damages. Plaintiff also fears that jurors will be influenced in their liability deliberations by their desire not to spend any further time on the case. While Plaintiff is right on the first argument, that does not weigh against bifurcation—it only confirms that no *trial time* will be saved. As to the second argument, I believe that a proper jury instruction can dispel Plaintiff's worry that it will be prejudiced.

On balance, I conclude that the jury will benefit by focusing on fewer issues and less evidence when it deliberates. The damages issues will be tried directly after the jury has reached a verdict on liability. The damages trial is not to exceed one week, exclusive of charge and deliberations.

## II. Rulings on Motions *in Limine*

### 1. Plaintiff Union Carbide Corporation's ("UCC") motion *in limine* to preclude Defendant Montedison S.p.A. ("ME") from offering any evidence relating to Bhopal (Plaintiff's Motion Number One)

■ Pursuant to Rules 402 and 403 of the Federal Rules of Evidence ("FRE"), UCC's motion to preclude evidence or argument relating to the disaster at Bhopal, India is granted. The prejudice and confusion that would result from the admission of this evidence, which is only of the slightest relevance, outweighs its probative value.

2. This case has been very burdensome to the judicial system. In the close to four years that the case has been pending, the parties filed nine (9) motions, apart from the thirty (30) motions now pending. Two magistrate judges have handled innumerable discovery and trial disputes,

### 2. UCC's motion *in limine* to preclude ME from offering evidence of or referring to other litigations previously filed by UCC (Plaintiff's Motion Number Two)

■ Plaintiff's motion to preclude Defendant from offering evidence of or referring to other litigation previously filed by UCC, particularly *Union Carbide Corp. v. Exxon Corp.*, 94 Civ. 8866(LAP) (S.D.N.Y. filed Dec. 8, 1994), is granted pursuant to FRE 401, 403, and 404(b).

Both parties cite to *McCormick on Evidence* § 196 (Other Claims, Suits, or Defenses of a Party) to support their arguments for inclusion or exclusion of this evidence. Section 196 states that judges, balancing probative value against prejudice, should admit evidence of prior litigation "only if the probability of coincidence seems negligible or if the proponent has distinct evidence of fraud." 1 *McCormick on Evidence* at § 196 (4th ed.1992). ME has conceded that it has no specific evidence of fraud on UCC's part. *McCormick* offers guidance as to what evidence courts typically consider in determining whether to admit evidence of prior litigation when fraud is not alleged and the "probability of coincidence" is at issue:

The likelihood of repeated, substantially identical claims depends on the number of claims and the probability of each accident. The degree of similarity among the claims is also important, inasmuch as a series of disparate but bona fide claims seems more likely than a string of very similar ones.

*Id.* at § 196 n. 10.

In neither its response to Plaintiff's motion, nor at oral argument, did ME identify any prior litigation it wishes to introduce at trial, except for *UCC v. Exxon. See* Nov. 4, 1998 Tr. at 263–267. Because ME only seeks to introduce evidence of a single prior claim, the motion is granted. The prejudice created by this evidence outweighs its probative value, if indeed it has any probative value.

including 2,300 objections to proposed trial evidence. The parties have also retained four (4) special masters to assist in resolving complex motions and supervising settlement talks. In addition, the Court has already issued five (5) significant opinions in this matter.

The real purpose of offering this evidence, it appears, is to accuse UCC of shady business practices and bad motives—in short "unclean hands." As discussed at page 11 below such proof is not permissible in this type of case.

### 3. UCC's motion *in limine* to preclude ME from offering evidence of or referring to certain conduct by UCC for the purpose of showing purported similarity to Defendant's alleged unlawful conduct (Plaintiff's Motion Number Three)

Plaintiff's motion pursuant to FRE 403 to preclude evidence of or reference to certain conduct it undertook for the purpose of showing that such conduct was similar to Defendant's alleged unlawful conduct is denied in part and granted in part. In this motion, UCC seeks to preclude certain evidence related to Project Global,[3] including the following:

(1) UCC's consideration of antitrust issues presented by Project Global;

(2) The projected competitive strength or position of Global Plastics,[4] including whether it would be the largest polyolefins company in the world;

(3) Communications and/or agreements within UCC or between UCC and ENI, EniChem, or any other person or entity regarding acquiring or venturing with ME or Himont that do not directly reference the CUA or Nautilus, including the vast majority of evidence before October 1990 and after August 1991; and

(4) Plans, actions, opinions, or communications by or with UCC with respect to ME's or Himont's polyethylene business, including the Spherilene technology.

■ With regard to these four categories, ME may offer evidence to prove that UCC's pursuit of Project Global caused delays in the Project Nautilus [5] discussions which, in turn, may have led to the termination of Project Nautilus. This evidence may include events occurring prior to October 1990. This evidence is admissible on the issue of causation.

■ With regard to the first category, ME may elicit, during the cross-examination of UCC witnesses, that UCC employed tax consultants and lawyers to consider issues raised by Project Global. However, ME may not elicit the fact that UCC analyzed the "antitrust liability" of Project Global. *See* Nov. 3, 1998 Tr. at 121.

With regard to the second and third categories, ME may not argue that UCC's participation in the Project Global negotiations was analogous to ME's alleged misconduct, although ME is not precluded from arguing that UCC's involvement in Project Global suggested that the CUA allowed the parties to terminate the CUA to pursue other business opportunities. Nor may ME use evidence of Global Plastics or Project Global to

3. "Project Global" refers to UCC's negotiations with ENI, a company owned by the Government of Italy, to acquire Himont, ME's polypropylene subsidiary, in order to create a global polyolefins company combining their polyethylene and polypropylene assets ("polyolefins" are a group of compounds which include polyethylene, polypropylene, and polybutylene). ME contends that UCC's simultaneous pursuit of Project Global and Project Nautilus (the UCC/SOC venture) caused UCC to delay the Nautilus discussions. ME further argues that UCC's inattention to Nautilus proximately caused Shell Oil Company ("SOC") to exercise its right to accept Royal Dutch Shell's ("RDS") invitation to participate in Project Sophia talks. Project Sophia was the ME/RDS joint venture later to become Montell. Therefore, according to ME's theory, any injury to UCC resulted not from ME's alleged conspiracy with SOC to interfere with Project Nautilus, but from UCC's own conduct. Defendant also seeks to show that UCC's pursuit of Project Global establishes that the Cooperative Undertaking Agreement ("CUA") allowed SOC and UCC to pursue alternative business opportunities. Finally, Defendant seeks the admission of evidence relating to Project Global in order to prove that this lawsuit is really about UCC's competition with RDS to obtain Himont, and that UCC's loss in that competition is not an antitrust injury. *See* Defendant's Response to Plaintiff's Motion *in Limine* to Exclude Evidence of or Reference to Alleged Conduct of Plaintiff for the Purpose of Showing Purported Similarity to Defendant's Unlawful Conduct at 1–2.

4. Global Plastics refers to a 1990 business proposal by ENI to UCC for the purpose of purchasing Himont.

5. Between 1989 and 1991, Project Nautilus negotiations involved a proposed expanded joint venture between SOC and UCC which contemplated the building of two new polypropylene resin plants.

argue that UCC violated the antitrust laws and therefore comes to court with "unclean hands." *See Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

As discussed below, UCC has moved separately to preclude the fourth category and other evidence concerning UCC's polyethylene business in Plaintiff's Motion Number 12. *See* below Part II.8.

**4. UCC's motion *in limine* to preclude testimony by Professor Sharon Oster, Defendant's damages expert, regarding opinions not properly disclosed to Plaintiff (Plaintiff's Motion Number 4)**

UCC withdrew this motion during a conference held on October 30, 1998.

**5. UCC's motion *in limine* to preclude Dr. Carl Shapiro, Defendant's expert, from referring to the opinions or conclusions of Defendant's former expert Dr. Jamil Wakim (Plaintiff's Motion Number 5)**

■ Pursuant to an agreement between the parties reached during oral argument on November 4, 1998, UCC's motion to preclude Dr. Shapiro from referring to the opinions or conclusions of Jamil Wakim is withdrawn. *See* Nov. 4, 1998 Tr., at 270–272. Specifically, the parties agreed that during UCC's cross-examination, Professor Shapiro may disclose the bases for his opinions, including his reliance on the work of Dr. Wakim. *See id.* Dr. Shapiro may not testify, however, as to what various individuals allegedly told Dr. Wakim. Plaintiff may offer portions of Dr. Wakim's deposition testimony in rebuttal.

**6. UCC's motion *in limine* to preclude evidence of or reference to an alleged relevant product market other than the worldwide market for Total Package Licenses (Plaintiff's Motion Number 10)**

■ Plaintiff's motion to preclude evidence of or reference to an alleged relevant product market other than the worldwide market for Total Package Licenses ("TPL") is denied. Defense expert Carl Shapiro's opinion that the "polypropylene technology market" is the relevant product market for the purposes of this case is admissible.

■ Contrary to UCC's argument, Special Master Bernard Black assumed, solely for the purpose of summary judgment, that UCC's alleged TPL market was the relevant market. This assumption was not a *finding*, as a court does not resolve disputed issues of fact on a summary judgment motion. The burden of establishing the contours of the relevant market in a federal antitrust action rests with the private plaintiff. *See* ABA Antitrust Section, Antitrust Law Developments 544 n. 237 (4th ed.1997). Determining the relevant product market is a fact issue to be determined by the jury. *See e.g., Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (proper market could only be found after "factual inquiry"); *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir.1984) (genuine issues of fact concerning relevant market precluded summary judgment).

**7. UCC's motion *in limine* to preclude evidence of or reference to Plaintiff's profits and financial condition (Plaintiff's Motion Number 11)**

■ Plaintiff's motion to preclude evidence of or reference to UCC's profits and financial condition is granted in part and denied in part. During oral argument on this motion, the Court learned that ME seeks to offer only two items of evidence. The first item is two redacted letters from UCC executives published in UCC's Annual Report of 1992. ME argues that these letters are relevant to establish that the reduction in research and development spending by the CUA was caused by UCC's decision to cut costs. This evidence, as redacted in Exhibit A annexed hereto, is admissible to prove causation and to mitigate damages. *See* Nov. 5, 1998 Tr., at 304–311.

■ Defendant also seeks to elicit testimony from UCC executives as to UCC's

financial situation subsequent to UCC's purchase of Shell Polypropylene Company's ("SPC") assets in 1995. ME argues that because UCC was financially able to build new resin plants, it cannot claim that it was damaged by Shell Oil Company's ("SOC") withdrawal from Project Nautilus, which contemplated the joint construction of the new resin plants. As this proof is relevant to UCC's damages claim, Defendant may elicit a general admission of UCC's 1995 financial condition. *See id.* at 301–302.

ME has agreed not to offer any evidence of or make reference to UCC's gross financial data or UCC's Annual Reports from any year except 1992, unless necessary to impeach the credibility of a UCC witness. Should such a need arise, Defendant must seek the Court's permission before offering such evidence. *See id.* at 311.

**8. UCC's motion *in limine* to preclude evidence of or reference to its polyethylene business (Plaintiff's Motion Number 12)**

 Plaintiff's motion to preclude evidence of or reference to its polyethylene business is granted in part and denied in part.[6] UCC's motion is denied insofar as ME may offer evidence of UCC's business policies relating to its polyethylene business to establish UCC's alleged neglect of or delay in pursuing the Project Nautilus discussions. Plaintiff's motion is granted in part, such that evidence of UCC's "dominant" market share in the polyethylene industry is inadmissible.

**9. UCC's motion *in limine* to preclude evidence of or reference to compromise, offers of compromise, and conduct and statements made in relation to compromise negotiations (Plaintiff's Motion Number 13)**

Plaintiff's motion to preclude evidence of compromise under FRE 408 is granted in

part and denied in part. At oral argument, ME agreed that it would not seek to offer such evidence, except as to four specific areas: (1) a counterproposal that UCC made to SOC in December 1992, which followed SOC's proposal to UCC in August 1992, regarding the termination of the CUA; (2) a presentation by UCC in September 1993 on Project Romeo, which concerned UCC's proposal to purchase Himont's North American resin plants; (3) evidence of discussions that occurred in the interim periods not covered by the secrecy agreements executed by the parties; and (4) evidence regarding UCC's purchase of SPC's polypropylene-related assets in February 1995 at a 15% "discount" and evidence regarding Morgan Stanley's appraisal of such assets. *See* Nov. 4, 1998 Tr., at 211–234.

 As to categories (1) and (2) above, UCC's motion to preclude the evidence is denied. Such discussions and documents comprised business communications rather than settlement negotiations. Moreover, such evidence is not being introduced for the purpose of proving the invalidity of Plaintiff's claims or the amount of damages it suffered, but rather to provide the jury with the context and information necessary to understand the case and because it is relevant to the issue of causation. *See MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1152 (7th Cir.1983).

With regard to the third category, the parties have not yet provided the Court with specific dates during which the secrecy agreements were ineffective or any specific evidence relating to those time periods. If and when such details are provided to the Court, a further ruling regarding the admissibility of such evidence will be made.

The evidence described in the fourth category is also addressed in Plaintiff's Motions *in limine* Numbers 15 and 17. Because of the decision to bifurcate the damages portion

---

**6.** The Court notes that this motion is strikingly similar to UCC Motion # 3 in which UCC moved to preclude this and other evidence of UCC's polyethylene business, discussed above at Part II.3. In that motion, UCC moved to preclude evidence of "[p]lans, actions, opinions, or communications by or with UCC with respect to

Montedison's and/or Himont's polyethylene business, including Spherilene technology." *See* Plaintiff's Memorandum in Support of UCC's Motion *in Limine* to Exclude Evidence of or Reference to Alleged Conduct of UCC for the Purpose of Showing Purported Similarity to Defendant's Unlawful Conduct at 9.

**842**

of the trial, decision on these motion is deferred.[7]

UCC's motion is granted with regard to any other evidence relating to compromise offers or negotiations.

### 10. UCC's motion *in limine* to preclude evidence of or reference to alleged accidents or explosions in plants utilizing UCC technology, or evidence of or reference to alleged defamation of ME's technology by UCC (Plaintiff's Motion Number 14)

Plaintiff's motion to preclude evidence of or reference to alleged accidents or explosions in plants utilizing UCC technology, or evidence of or reference to alleged defamation of ME's technology by UCC, is granted in part and denied in part. UCC's motion is granted with respect to evidence of alleged accidents, explosions or fires in plants utilizing UCC technology, pursuant to FRE 403. ME may offer evidence of UCC's alleged defamation of ME's technology in order to establish Dr. Galli's state of mind at the time he wrote the memorandum to Mr. Trapasso (the "Galli Note").

### 11. ME's motion *in limine* to preclude evidence of events unrelated to the conduct challenged by UCC in this case (Defendant's Motion Number 3)

ME's motion to preclude evidence of unrelated conduct is granted in part and denied in part. The motion addresses a number of different topics that UCC plans to address at trial. Prior to oral argument on the motions *in limine*, UCC and ME agreed that UCC would not offer any evidence as to three of the following subjects: (1) the alleged illegality or impropriety of ME's actions relating to the formation of Himont in 1983; (2) ME's catalyst manufacturing agreement with Stauffer in 1984; and (3) ME's claims that SOC's current generation polypropylene catalyst technology ("SHAC") infringed the po-

lypropylene catalyst patents of Montedison, Mitsui, or Himont, or their subsidiaries or affiliates. *See* Joint Proposed Pre–Trial Order § 14, Stipulation 3. The two remaining disputed areas of evidence are: (1) the European Community's ("EC") price fixing investigation into the polypropylene resin market; and (2) the alleged bribery of certain officials of the Italian government.

ME seeks to preclude evidence of an EC investigation into a price-fixing agreement that occurred between 1977 and 1983 among European polypropylene producers, including RDS and ME. The investigation ended approximately eight to ten years before the conspiracy at the heart of this case is alleged to have occurred. UCC seeks to offer this evidence to give historical background to ME's continuing course of behavior in order to prove *motive* for ME's alleged anti-competitive conduct. UCC seeks to prove that ME's behavior in controlling prices in the resin market demonstrates ME's motive for conspiring to restrain trade in and/or monopolize the TPL market. Proof of motive is an exception under FRE 404(b) which would otherwise bar the admission of evidence of prior bad acts.

This evidence is relevant to show ME's motive. The 1977–1983 investigation is close enough in time to be probative of ME's continuing course of behavior. While the evidence is prejudicial to ME, it is not unduly so. Thus, UCC may introduce evidence of the EC investigation into alleged price-fixing in the polypropylene resin market.

The second remaining disputed area of evidence relates to the "clean hands" investigation conducted by Italian authorities into allegations of political corruption and bribery in Italy between 1989 and 1992. ME seeks to preclude evidence of two specific bribes: (1) an alleged November 1990 bribe by Montedison executives to the Italian authorities overseeing the sale of EniMont's [8]

7. Plaintiff's Motion *in limine* Number 15 seeks to preclude evidence relating to the alleged 15% discount. Plaintiff's Motion *in limine* Number 17 seeks to preclude the testimony of William D. McCombe, the Court-appointed appraiser of SPC's assets. Defendant seeks to offer Mr. McCombe as a fact witness with personal knowl-

edge of the appraisal proceeding. Defendant argues that Mr. McCombe's testimony is relevant to the mitigation of damages.

8. EniMont was a joint venture between the state-owned chemical company, ENI, and ME's polypropylene assets.

shares in order to obtain a higher price for those shares;[9] and (2) Montedison's alleged bribes to Italian government officials in the summer of 1991 in order to deter a potential deal between UCC and ENI.[10]

UCC seeks admission of this evidence to rebut ME's evidence of UCC's interest in Global Plastics, and evidence that UCC and ENI discussed the possibility that UCC might be a "white knight" to protect ENI from ME's attempts to take over EniMont in September of 1990. In Plaintiff's Motion Number Three to preclude Project Global-related evidence, discussed above at Part II.3, UCC argues that it should be entitled to rebut evidence of ENI's "white knight" proposal to UCC with evidence that EniMont's dissolution was caused by factors other than UCC's attempt to buy its assets, including, *inter alia*, ME's criminal attempt to affect EniMont's business. *See* Pl.'s Mot. Number 3 at 9 n. 9. This rebuttal would require the admission of evidence establishing ENI's reasons for its search for a "white knight" and the reasons why the EniMont transaction failed (i.e. ME's improper efforts to influence government officials). Because I am permitting ME to offer evidence of communications between ENI and UCC, as long as ME does not attempt to imply UCC's "unclean hands," I will permit UCC to rebut such evidence by proving that ME "lobbied" Italian government officials in an effort to prevent the UCC/ENI agreement.

The evidence of ME's conduct is clearly relevant to proving ME's motive and intent. However, to prevent undue prejudice to Montedison from association with political corruption, no reference to "bribes" will be permitted. Instead, UCC may present evidence that ME "lobbied" the Italian Government in an effort to sell its interest in Eni-Mont at an inflated price and to prevent the UCC/ENI deal. *See* Nov. 4, 1998 Tr. at 198. UCC will not be permitted to offer proof as to any criminal convictions of Montedison executives.

■ UCC also seeks to use evidence of Himont/Mitsui market allocation, revenue sharing, and price coordination activities to establish that such activities caused significant injury to competition. ME does not seek to exclude this evidence, but only requests that UCC not refer to ME's conduct as "unlawful" or "anti-competitive." *See* Nov. 4, 1998 Tr. at 168. UCC has agreed not to argue that the conduct was illegal, but still seeks to have its experts opine that the licensing market was "anti-competitive." *See id.* at 173.

UCC's experts are not permitted to testify as to their legal conclusions with respect to these activities. They are not to testify that this conduct was either "anti-competitive" or "unlawful." *See id.* The witnesses are permitted to opine that the licensing market was "not competitive" and to explain how they reach that conclusion. *See id.*

**12. ME's motion *in limine* to preclude evidence of Himont's technology licensing practice (Defendant's Motion Number 4)**

■ ME's motion to preclude evidence of Himont's technology licensing practice prior to 1991 under FRE 402 and 403 is denied. UCC intends to argue that ME perceived that UCC's unrestricted licensing practices posed a threat to ME's alleged "restrictive" licensing practices. Evidence of the restrictive practices is therefore relevant to show ME's motivation and economic incentive for engaging in its alleged unlawful conduct. On balance, the probative value of this evidence outweighs any unfair prejudice.

**13. ME's motion *in limine* to preclude evidence of polypropylene resin pricing and expressions of concern by polypropylene resin customers (Defendant's Motion Number 5)**

Defendant seeks to preclude two different categories of evidence. First, Defendant

---

9. Pursuant to a court-ordered break-up of Eni-Mont in Italy, the Italian government seized Eni-Mont's assets. ME then allegedly bribed government officials to obtain an artificially-inflated price for the EniMont assets and attempted to sell its half of the EniMont assets at this price.

10. UCC alleges that this second bribe resulted in a two-year suspension of talks between UCC and ENI before the companies were able to reach an agreement.

seeks to preclude evidence of Himont's polypropylene resin pricing policies on the ground that it is irrelevant and prejudicial. Second, Defendant seeks to preclude expressions of concern by SOC's polypropylene resin customers about the formation of Montell under FRE 402, 403, 801 and 802.

 Plaintiff seeks to introduce evidence of Himont's resin pricing policies. Defendant argues that the polypropylene resin market is distinct from the TPL market and that the portion of UCC's complaint alleging antitrust violations relating to the North American polypropylene resin market has already been dismissed on summary judgment.[11] UCC argues that the resin market and the TPL market are necessarily interrelated and that evidence of Himont's resin pricing policies is relevant to show ME's intent to dominate and control the worldwide TPL market and destroy UCC's contractual relationship with SOC. This evidence is probative of ME's participation in a conspiracy to eliminate or limit resin-producing competitors so as to protect Himont's resin prices, which may in turn be probative of ME's attempts to restrain trade in and/or monopolize the TPL market.

Plaintiff also seeks to introduce evidence through SOC employees that their resin customers expressed concern about the negative effects the Sophia venture would have on the UCC/SOC venture. Essentially, customers expressed concern that SOC would no longer be committed to its polypropylene business once its parent company, RDS, became involved with ME.

 UCC argues that these customer comments fall under the present sense impression exception to the hearsay rule since as customers they were relating their views to SOC employees, who made a contemporaneous record of those comments. See FRE 803(1). ME goes on to argue that these contemporaneous records are admissible as business records. See FRE 803(6). UCC finally argues that these statements by SOC should be admissible to show SOC's state of mind. See FRE 801(c). All of these arguments are frivolous. The resin customers' statements are not present sense impressions—they lack the assurances of trustworthiness and contemporaneity required to be admissible. See 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 803.03 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1998). Furthermore, the recording of these statements are not business records and the proof does not establish anything regarding SOC's state of mind.[12] This evidence is not admissible.

14. **ME's motion *in limine* to preclude evidence of settlement of this action by any or all of the defendants other than ME (Defendant's Motion Number 8)**

Defendant's motion to preclude evidence of settlement of this action by any or all of the defendants other than ME was withdrawn by ME. During oral argument both parties stipulated to the following instruction at trial: "The only defendant before you in this case is Montedison, and you should not speculate as to why any other company is or is not present in this case as a defendant." See Nov. 3, 1998 Tr. at 130–131.

### III. Conclusion

The rulings contained herein address sixteen of the motions *in limine*. The remaining motions will be decided prior to trial. A conference is scheduled for November 23, 1998 at 5:30 p.m.

**11.** *See Union Carbide Corp. v. Montell N.V.*, 27 F.Supp.2d 414, 416–419, 1998 U.S.Dist. LEXIS 12009, at *4–15 (S.D.N.Y.1998).

**12.** UCC is attempting to prove the motives of both SOC and its licensing customers through proof of the motives of its resin customers in lodging complaints. This transference is illogical.

Union Carbide Corporation Annual Report 1992

UCC 0104653

DEFENDANT'S
EXHIBIT
6147

11/05/98 13:03 SKADDEN ARPS → 212 806 7920 NO.816 P.14

## Chairman's Letter

**TO OUR SHAREHOLDERS:**

 f all the headlines of the past year, our favorites, and perhaps yours, were the ones reporting that Union Carbide was the year's best-performing stock on the Dow Jones list of 30 industrials.

Investors and analysts also realized that we meant what we said about streamlining operations and cutting costs. Our employees are doing a splendid job in the face of downsizing and difficult business conditions. They are working long and hard, with great ingenuity, to cut costs, improve productivity and increase the value of your company.

At year-end 1992 — halfway into our four-year, $400 million profit improvement program — we are ahead of schedule, having already achieved more than 75 percent of our goal. (Details are in the Profit Improvement Update that follows this letter.) In fact, cost reductions and other profit improvements accounted for nearly all of Carbide's operating profit during the year.

The accelerated profit improvement program helped to generate a return on invested capital in the trough of the chemical business cycle nearly as high as the average return of past years for the entire cycle. That means we are better prepared to cope with the continuing price pressures of the downturn, and it bodes well for performance when the cycle turns up.

But that won't be for awhile. The year just ended was one of the toughest in memory for much of the chemical industry, and for Union Carbide. A combination of rising raw material costs, industry overcapacity in major product lines and economic recession in much of the industrialized world resulted in weak margins and depressed earnings throughout the year.

By far the greatest external influence on 1992 operating performance was the price pressure resulting from industry overcapacity. Margins for such high-volume products as ethylene glycol and polyethylene, which account for a large share of Carbide's sales and income, fell to record low levels. As the year ended, some price relief seemed possible, but it was clear that the price effects of overcapacity would be with us again in 1993.

We are sometimes asked why Union Carbide is opting to strengthen its position in basic chemicals, whose earnings rise and fall precipitously with the cycle, when other companies are concentrating on less cyclical specialty chemicals.

Of course, Union Carbide itself has a number of less cyclical businesses that provide a reliable and growing earnings base, namely solvents and coatings, specialty polyolefins, technology licensing and a group of high-quality specialty chemical businesses. But it's the competitive strengths of our high-volume chemicals businesses that have the greatest potential impact on financial performance.

When they are operating at peak efficiency, their process technology leadership and huge size should enable us to outperform our most efficient competitors in good times and bad.

Thus our strategic goal of becoming the low-cost leader in our segment of the industry, and the company that customers most want to deal with, is now very clear. It focused our financial and operating strategy during the year, and helped to reassure customers of our commitment to their long-range product and service needs.

SUBJECT TO PROTECTIVE ORDER IN UCC V. HMONT CONFIDENTIAL

UCC 0104656

*Chairman and Chief Executive Officer Robert D. Kennedy*

With all the progress. I am particularly proud of the work going forward to keep improving Union Carbide's environmental performance.

We are deeply committed to the Chemical Manufacturers Association's RESPONSIBLE CARE initiative. which requires members to show continual and measurable improvement in environmental performance. We encourage stockholders to review our performance against those codes by writing to our Public Affairs Department for a copy of our 1992 RESPONSIBLE CARE Progress Report.

Carbiders are gratified to see the company being described by security analysts as a "turnaround situation. We agree that many good things are happening at our company. In addition to the operating improvements. we are working hard to create a workplace that puts a high premium on excellence. and a workforce that increasingly reflects the diversity of the general population.

We believe these changes mean that employees. and our stockholders and customers. will see Union Carbide continue to grow stronger in 1993 and through the rest of the decade.

Two Board members who have made important contributions to the Corporation will not be standing for reelection. In keeping with the Board's retirement policy. Russell E. Train is retiring after more than 15 years of distinguished service. Dr. Alice M. Rivlin resigned effective Jan. 20, 1993. to take up her duties as Deputy Director of the Office of Management and Budget in the Clinton Administration.

I know the entire Board will miss the experience and wise judgment they brought to our deliberations.

Robert D. Kennedy
February 10. 1993

SUBJECT TO PROTECTIVE ORDER
IN RE V. WILCOX?
CONFIDENTIAL

UCC 0104657

11.05/98 15:03 SKADDEN ARPS → 212 805 7920 NO. 816 P02

## Profit Improvement Update II

ur $400 million profit improvement program looks beyond near-term performance to Union Carbide's strategic imperative of becoming the industry's lowest cost producer of key high-volume chemicals, and the preferred supplier in world markets for our products and services.

The program has meant wrenching change for Union Carbide employees, who, whether in staff functions or line operations, are being challenged to find innovative, cost-efficient ways to get the job done while meeting higher-than-ever quality standards. And they are delivering.

Selling, administrative and other expenses are down eight percent compared to 1991 and 19 percent (on a comparable basis excluding accounting changes) since the program was announced in 1990. Total fixed costs are down five percent compared to 1991 and nine percent since 1990. And despite the downward trend in selling prices, sales per employee are up nine percent over the same two-year period.

At the same time, we regard work process improvement as a continuing challenge that, even after we reach our current target, will bring further cost reductions as new initiatives take hold around the Union Carbide system.

The profit improvement initiative is a year ahead of schedule. And we have attained more than 75 percent of our four-year objective in the first two years alone. We now expect to reach our goal by the end of 1993 instead of year-end 1994, as originally planned.

Eliminating work and other costs that don't add value will improve efficiency and productivity, and enable the company to reap the full benefits of its leading-edge technologies and economies of scale.

The profit improvement initiative encompasses nearly a dozen major programs and scores of smaller projects. Together they are simplifying and otherwise improving the way Union Carbide manufactures, sells and distributes its products; manages its inventory; maintains production facilities and manages cash. Each of Union Carbide's major manufacturing sites began by implementing one or more of the programs. Once a program has proved successful at one site, we implement the new techniques and approaches at other sites.

Work process improvements in 1992 led to lower maintenance costs and inventories, more efficient cash management, improved customer service, fewer layers of supervision and improved productivity across the company. The accelerated pace of the program is attributable to employees' commitment to its goals. With new authority to find innovative ways to accomplish work at lower cost, our people are doing more and doing it better, without sacrificing quality or safety, and often without needing supervisors to ratify their decisions.

Not all the $400 million cost-savings target will reach the bottom line. In a period of overcapacity and price pressure, some of the benefits of cost cutting will no doubt go to customers, and there are one-time costs entailed in implementing new programs. Nevertheless, we believe that much of the savings will benefit earnings.

Cost reduction and productivity improvement are now a way of life in all of Union Carbide's businesses.

SUBJECT TO PROTECTIVE ORDER
IN UCC V. NIMONT
CONFIDENTIAL

UCC 0104658

Presdent and
Chief Operating Officer
William H. Joyce

Union Carbide made great strides last year in implementing work process changes that alter the way the company develops, manufactures, distributes and sells its products. This is driven by employees who are very clear about the close relationship between the company's earnings, its ability to pay dividends and to reinvest in its businesses, and their own compensation and career opportunities.

We're making rapid progress implementing our cost reduction program. When we attain our objective, Union Carbide's infrastructure costs should be comparable with those of the industry's most efficient companies. This will enhance performance of both the cyclical and noncyclical businesses in the company's portfolio, enabling Union Carbide to do more for employees and shareholders and to substantially increase its investment for growth.

William H. Joyce
President and Chief Operating Officer
February 10, 1998

SUBJECT TO PROTECTIVE ORDER
IN UCC V. NEMONT
CONFIDENTIAL

UCC 0104659 5