U.S. INFORMATION SYSTEMS, INC., Odyssey Group, Inc. and Blue Diamond Fiber Optic Networks, Inc., Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NUMBER 3, AFL–CIO, A R Communication Contractors Inc., Adco Electrical Corporation, Five Star Electric Corporation, Forest Electric Corporation, Hugh O'Kane Electric Company LLC, IPC Communications, Inc. and Nead Information Systems, Defendants.

No. 00 Civ. 4763RMBJCF.

United States District Court, S.D. New York.

Feb. 24, 2004.

Maxwell M. Blecher, Blecher & Collins, Los Angeles, CA, Richard A. Cirillo, Ralph A. DeSena, King & Spalding, New York City, Gerald Padian, Tashjian & Padian, New York City, Laura G. Weiss, law Offices of Laura G. Weiss, P.C., Pearl River, NY, for Odyssey Group, Inc.

James P. Bonner, Jill M. Levy, Shalov, Stone & Bonner, LLP, New York City, for IPC Communications, Inc.

Edward T. Byrnes, Murtagh, Cohen & Byrne, Rockville Centre, NY, for Adco Electrical Corp.

Brian Patrick Craig, Thomas P. Mohen, Mohen, Craig & Traecy, LLP, Locust Valley, NY, for AR Communication Contractors, Inc.

Lisa B. D'Alessio, King & Spalding, New York City, for Blue Diamond Fiber Optics Networks, Inc.

Richard H. Dolan, Jeffrey Morton Eilender, Schlam, Stone & Dolan, LLP, New York City, K. Richard Marcus, McDonough, Marcus, Cohn & Tretter, L.L.P., New York City, for Nead Information Systems.

Stephen F. Harmon, Jenkens & Gilchrist, Parker, Chapin, L.L.P., New York City, for Intern. Broth. of Elec. Workers, Local Union Number 3, AFL-CIO.

Steven I. Levin, Levin & Glasser, P.C., New York City, for Five Star Elec. Corp.

Kevin J. Toner, Heller, Ehrmann, White & McAuliffe, L.L.P., New York City for Forest Elec. Corp.

*MEMORANDUM AND ORDER*

FRANCIS, United States Magistrate Judge.

For want of unbiased data, expert evidence is lost. The defendants in this antitrust case have moved to exclude the proposed testimony of the plaintiffs' expert

witness, Dr. Frederick C. Dunbar, pursuant to Federal Rules of Evidence 702 and 703 on the ground that his methods and the resulting testimony are unreliable. Many of the defendants' arguments are without merit. However, because the plaintiffs have failed to demonstrate that the data set upon which Dr. Dunbar's analysis was based was unbiased, the defendants' motion must, in large part, be granted.

*Background*

The plaintiffs in this action are electrical contractors who employ workers represented by the Communications Workers of America, AFL–CIO (the "CWA") to install telecommunications systems for commercial customers. The plaintiffs allege that the defendants—who include the International Brotherhood of Electrical Workers ("IBEW") Local Union Number 3, AFL–CIO ("Local 3") and a number of electrical contractors—conspired to violate the antitrust laws by excluding from the market contractors who, like the plaintiffs, employ workers who are members of the CWA, rather than Local 3. The plaintiffs have alleged violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (the "Sherman Act"), and New York's Donnelly Act, N.Y. Gen. Bus. Law § 340 (the "Donnelly Act"). (Second Complaint dated Feb. 22, 2002 ("Sec.Compl.") ¶¶ 70–92).[1] The plaintiffs' principal claim is that the defendants have "combined and conspired with each other, and others presently unidentified, to carry out a common plan to coerce and induce building owners and tenants, building managers, general contractors, information technology consultants, and others in the construction industry to exclude the plaintiffs from the market for telecommunica-

tions installation work." (Sec.Compl., ¶ 36). The plaintiffs further allege that "[i]n the absence of collusion, each electrical contractor defendant would have an economic incentive to perform the electrical installation work correctly and without incident in order to satisfy the customer. No rationally profit-maximizing contractor in the defendants' position would commit the illegal activities that the defendants have committed except in furtherance of the unlawful conspiracy among the defendants." (Sec.Compl., ¶ 40). Finally, the plaintiffs claim that "because of the universal nature of, and reliance by all businesses upon, the telecommunications industry, an antitrust violation in this arena is especially harmful." (Sec.Compl., ¶ 46).

The plaintiffs seek to introduce the expert testimony of Dr. Dunbar on economic issues related to antitrust liability and damages in this case. (Declaration of Dr. Frederick C. Dunbar Opposing Defendants' "Daubert" Motion dated March 7, 2003 ("Dunbar Decl."), ¶ 1). Dr. Dunbar is a Senior Vice President of National Economic Research Associates, Inc. ("NERA"), specializing in antitrust and financial economics. (Dunbar Decl., ¶ 3). Dr. Dunbar's practice at NERA includes "providing valuation services, performing economic research on public policy matters, and consulting on antitrust economics." (Dunbar Decl., ¶ 4). Dr. Dunbar issued an initial report on October 3, 2002, as well as a rebuttal report on December 17, 2002, outlining his findings. (Dunbar Decl., ¶ 1). Additionally, he was deposed for three and one-half days regarding his conclusions. (Declaration of Jeffrey M. Eilender in Support of Defendants' Motion to Exclude the Testimony of Plaintiffs'

---

1. The plaintiffs' claim of tortious interference with contract and prospective business advantage (Sec.Compl., ¶¶ 93–98) was dismissed by the Honorable Richard M. Berman as to Local 3 only. *See U.S. Information Systems, Inc.*

*v. International Brotherhood of Electrical Workers Local Union No. 3*, No. 00 Civ. 4763, 2002 WL 91625, at *13 (S.D.N.Y. Jan.23, 2002).

Proposed Expert, Dr. Frederick C. Dunbar, dated Feb. 7, 2003 ("Eilender Decl."), ¶ 15). The defendants have submitted several expert reports of their own, including reports by a certified public accountant, Stephen W. Shulman, and economists Orley C. Ashenfelter, Henry S. Farber, and John R. Woodbury. (Expert Report of Stephen W. Shulman, CPA, dated Oct. 31, 2002 ("Shulman Report"); Expert Report of Orley C. Ashenfelter and Henry S. Farber dated Oct. 31, 2002 ("Ashenfelter/Farber Report"); Expert Report of John R. Woodbury dated Oct. 30, 2002 ("Woodbury Report")).

▆▆▆ Dr. Dunbar's initial report analyzed a number of issues that are relevant to the plaintiff's claim of monopoly leveraging—that is, the use of market power in one market (electrical installation services) to reduce competition and inflict antitrust injury in another market (telecommunications installation). (Dunbar Decl., ¶ 7; Expert Report of Frederick C. Dunbar dated Oct. 3, 2002 ("Dunbar Report") at 40). To establish a Sherman Act conspiracy, the plaintiffs must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) that such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the "rule of reason." *U.S. Information Systems*, 2002 WL 91625, at *4; *see also Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95–96 (2d Cir.1998). The plaintiffs must also "adequately ... define the relevant product market." *Rock TV Entertainment, Inc. v. Time Warner, Inc.*, No. 97 Civ. 0161, 1998 WL 37498, at *2 (S.D.N.Y.

Jan.30, 1998) (quotations and citation omitted). Finally, the plaintiffs must establish that they have "antitrust standing" and have suffered "antitrust injury." *National Camp Association, Inc. v. American Camping Association, Inc.*, No. 99 Civ. 11853, 2000 WL 1844764, at *3 (S.D.N.Y. Dec.15, 2000); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

In examining these elements of the plaintiffs' claims, Dr. Dunbar asserts that he applied "well-recognized statistical procedures to unbiased data as well as well-accepted economic theory to facts." (Dunbar Decl., ¶ 7). He summarized his findings in five categories.

### 1. *Market Power*

First, Dr. Dunbar examined the market for electrical installation and discussed how "market power" could be asserted in that market.

> Market power is the ability to raise prices above competitive levels persistently. Market power is absent if an attempt to raise prices above competitive levels would be made unprofitable by an increase in supply from other firms in the market or by short run entry from firms outside the market.

(Dunbar Report at 4). Using this "standard economic definition for market power," Dr. Dunbar concluded that the defendants have monopolized the market for electrical installation by controlling the supply of electricians.[2] (Dunbar Report at 5). Dr. Dunbar came to this conclusion by examining several factors.

---

**2.** Dr. Dunbar defined electrical installation as "electrical equipment that is fixed or to be fixed in, on, under or over any land." (Dunbar Report at 5). He went on to note that electrical contractors generally engage in one or more of the following tasks: "(1) performing electrical work at the site (e.g., installing wiring); (2) servicing electrical equipment at the site; and (3) the combined activity of selling and installing electrical equipment. The electrical work performed includes new work, additions, alterations, and maintenance and repairs." (Dunbar Report at 5).

First, he analyzed the market for electrical installation services generally and Local 3's role in that market. Local 3 is the sole collective bargaining agent of electricians in the New York metropolitan area, giving it significant power to control the labor force and raise the wages of its members. (Dunbar Report at 6). Because Local 3 does not deal directly with end users, it works in conjunction with electrical contractors to sell its members' services. (Dunbar Report at 7). Local 3 has agreements with the New York Electric Contracting Association and the Association of Electrical Contractors, Inc. that provide that for each job, certain key decision makers of the contractor must be Local 3 members. (Dunbar Report at 8). Additionally, a Joint Industry Board ("JIB"), consisting of fifteen members representing the union and fifteen members representing the employers, controls and manages the supply of electricians to the contractors and administers benefits and pensions. (Dunbar Report at 9).

To estimate the size of the electrical installation services market in the New York metropolitan area, Dr. Dunbar relied upon: (1) data that Local 3 produced in its semi-annual surveys regarding the total number of inside construction electricians and the number of electricians used in the commercial construction industry in Local 3's jurisdiction; (2) the ratio of the National Electrical Benefit Fund ("NEBF") wages earned within Local 3's jurisdiction relative to the county wages (data that was also produced by Local 3); (3) the value of commercial construction in New York State that is published by the Bureau of Census; and (4) data on the dollar value of the top construction projects in New York, as published by the New York Construction News. (Dunbar Report at 10). Local 3 surveys estimate that electricians employed on commercial projects represent about 35% of the total inside electricians and that NEBF wages represent 70% of the total wages of the relevant counties. (Dunbar Report at 10). From this, assuming all Local 3 workers to be equally productive, Dr. Dunbar calculated the wages of electricians who are working in the construction industry to be approximately $344 million. (Dunbar Report at 10–11). Assuming that labor represents 40% to 50% of the total value of the work, Dr. Dunbar estimated the size of the market for electrical installation to be in the range of $1 billion to $1.2 billion. (Dunbar Report at 11).

Dr. Dunbar next examined Local 3's dominance over the supply of electricians to large commercial projects within its jurisdiction. After reviewing evidence from several sources, including testimony of members of the JIB, testimony of a member of the IBEW, and court transcripts from cases dealing with Local 3 over the past 60 years, Dr. Dunbar concluded that "electrical contractors who are bidding on electrical installation jobs in the New York metropolitan area employ only Local 3 electricians." (Dunbar Report at 11–14).

### 2. Distinct Markets

Dr. Dunbar next examined the market for telecommunication installation services and the market for electrical installation services to determine whether there were strong economic reasons for providing the two services together. He concluded that the two markets are "historically separate," that "the jobs are bid separately and often the contractors are two independent companies," and that there are "no obvious economies to having electrical and telecom installation provided by the same contractor." (Dunbar Report at 14). In analyzing the size of the telecommunications installation market, Dr. Dunbar relied heavily on a consulting report for Information Transport Systems ("ITS"), a New York telecommunications contractor.

(Dunbar Report at 15). The report estimated that the size of the New York metropolitan market was between $300 million and $500 million annually. (Dunbar Report at 15).

Dr. Dunbar identified several reasons why the provision of telecommunications installation is separate from electrical installation. First, telecommunications installation requires specialized training different from the training needed to perform electrical installation. (Dunbar Report at 17). Based on a survey conducted by the IBEW and the National Electrical Contractors Association ("NECA"), the IBEW concluded that in Local 3, the percentage of the union's journeymen who can perform telecommunications installation work is about 38%, with just over half of those actually having the certification to do so. (Dunbar Report at 17). Relying on this same survey, Dr. Dunbar pointed out that when asked whether their region could support a separate telecommunications unit within their local area and whether such a unit would require separate classifications, training programs and agreements, over 80% of local unions responded that their area could support a separate unit, and over 90% responded that such a unit would require a distinct structure. (Dunbar Report at 18).

Next, Dr. Dunbar pointed to the separate bidding processes for telecommunications and electrical installation supporting his determination that the two markets are distinct. Dr. Dunbar discussed the way that "bid leveling" sheets are prepared by consultants hired to review bids submitted by various parties. Separate bid leveling sheets are prepared for the electrical and telecommunications segments of each project. (Dunbar Report at 21). Dr. Dunbar identified several examples, including the renovations on the Doubletree Hotel in New York City and the construction project for the National Football League's offices. (Dunbar Report at 21–22).

Finally, Dr. Dunbar attempted to show that "[t]he defendants, and industry participants in general, view electrical and telecommunications installation as separate markets." (Dunbar Report at 23). He examined the 2002 Strategic Marketing Plan" of ITS and defendant IPC Communications, Inc., as well as the depositions of various parties and non-parties, to demonstrate what he found to be a generally-held belief that the markets are distinct. (Dunbar Report at 23–24).

### 3. Anticompetitive Conduct

Dr. Dunbar next examined whether there was "parallel behavior, motive and opportunity, the ability to communicate, and behavior that was inconsistent with independent action in a competitive market" in order to determine whether there was anticompetitive conduct by the defendants. (Dunbar Decl., ¶ 25; Dunbar Report at 25–35). He asserted that this methodology is widely accepted by economists and that "[p]laintiffs often point to parallel business behavior, such as stable, noncompetitive pricing, and add it to evidence that implies the existence of an explicit agreement. Thus, plaintiffs search for so-called plus factors—i.e., other factors and circumstances that supplement evidence of parallel behavior—to support an inference of conspiracy." (Dunbar Decl., ¶ 25). He concluded that "Local 3, in concert with defendant electrical contractors, engaged in anticompetitive conduct to injure competition in the telecommunications installation services market." (Dunbar Report at 25). Dr. Dunbar claimed that "the predictions of market equilibrium when suppliers would be competing independently on the merits are quite different from the outcomes that are observed in this market." (Dunbar Decl., ¶ 29). According to Dr. Dunbar, this im-

balance in market equilibrium leads to the situation where "the union needs the contractors to leverage its monopoly into telecommunications; and the contractors employ the reputation effect of being able to control delays and vandalism in order to compete with lower-priced, equally or better qualified CWA contractors." (Dunbar Decl., ¶ 29).

Dr. Dunbar reached his conclusions by examining several factors: (1) lack of demarcation between Local 3 and the electrical contractors, (2) communication by defendant electrical contractors of Local 3's threats of possible vandalism and unwillingness to work overtime, (3) the failure to discipline workers who refused to work, (4) the incentive of defendant electrical contractors that rely on Local 3 labor to act in concert with Local 3 to reduce competition from lower priced bidders that use CWA labor, and (5) the benefits that would come to the defendant electrical contractors based on this scheme. (Dunbar Report at 25–29). Dr. Dunbar identified several instances where the plaintiffs' telecommunications installation work was vandalized. He pointed to deposition testimony from various sources claiming that members of Local 3 committed these acts of vandalism. (Dunbar Report at 29–32). He also described instances when the defendants "agreed not to work overtime on projects where the plaintiffs (or other firms that did not use Local 3 labor) obtained the telecommunications installation services contract." (Dunbar Report at 32–35 & Attachment 4).

4. *Injury to Competition*

■ After looking at the conduct described above, Dr. Dunbar concluded that it constituted "an attempt by the union and co-defendants to expand into a distinct market." (Dunbar Report at 35). He opined that "[i]f such an expansion was from competition on the merits, then we would expect lower prices and/or improved service quality.... Local 3 intends to extend its monopoly power from electrical installation into telecommunications installation with the result being higher prices and no service improvement." (Dunbar Report at 35). Dr. Dunbar asserted that "[a]ll of the elements necessary to establish a monopoly-leveraging claim are present here. The practices permitted the defendants to gain a competitive advantage over the plaintiffs in the telecommunications installation services market, causing injury to both the plaintiffs (in the form of lost profits and business) and to consumers generally (in the form of higher prices)." (Dunbar Report at 35).[3]

Dr. Dunbar addressed a common criticism of the monopoly leveraging argument: that "there is only one monopoly profit, which implies that the monopolist gains nothing by seeking to leverage its monopoly into another market;" the monopolist would instead "charge the monopoly price in its primary market and garner its monopoly profits there." (Dunbar Report at 36). Dr. Dunbar disputed the relevance of that argument to the facts at hand for several reasons. First, because individual members of the union get compensation only if they actually work, the union cannot simply increase the union wage and reduce the total number of hours worked, as that would deny some members of the union any benefit:

---

**3.** To state a monopoly leveraging claim, a plaintiff must allege that the defendants "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage over [plaintiffs] in another distinct market; and (3) caused injury by such anticompetitive conduct." *Virgin Atlantic Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir.2001).

[T]he nature of the union implies that it can extract some, but not all, of the monopoly profits available in its primary market, the market for electrical installation services. Consequently, it would benefit by increasing the number of hours worked in markets other than the electrical installation services market, such as the telecommunications installation market. Given that the defendants charge higher prices than other parties that supply telecommunications installation services, they could either lower the prices that they charge in that market (a competitively acceptable practice) or take steps to leverage their monopoly power in the electrical installation market into the telecommunications installation market (a competitively harmful practice).

(Dunbar Report at 36).

Dr. Dunbar also asserted that, because craft trades other than electrical installation contractors are also present at the construction site, the defendant contractors would have an incentive to extend their monopoly into other trades in order to avoid sharing profits. (Dunbar Report at 36–37). According to Dr. Dunbar, as a result of such incentives, "the defendants repeatedly took steps to dissuade the customers of telecommunications installation services ... from utilizing the services of the plaintiffs for reasons not related to competition on the merits but rather to achieve anticompetitive ends." (Dunbar Report at 37). Additionally, Dr. Dunbar claimed that there is "considerable evidence that the defendants charged significantly more for telecommunications installation services than did the plaintiffs." (Dunbar Report at 38). To make this determination, he "analyzed the bidding and bid leveling data" which purportedly shows that "bids submitted by Local 3 contractors for telecommunication installation services are 46% higher than those submitted by CWA contractors." (Dunbar

Decl., ¶ 34; Dunbar Report, Exhs. V–1, V–2, V–3). Based on the data, he also contended that "for those instances in which a CWA contractor was the low bid, but the contract was awarded to a Local 3 contractor, the customer paid on average 36% more than the low bid." (Dunbar Decl., ¶ 34).

Because of what he identified as "anticompetitive leveraging," Dr. Dunbar asserted that "Local 3 contractors have managed to coerce consumers into hiring them at higher prices." (Dunbar Report at 40–41). Out of 24 bids for which he had data on the winning bidder, he found that a CWA contractor was chosen only three times and that a Local 3 contractor was chosen 20 times (and in one case the union affiliation was unknown). (Dunbar Report at 41). This, according to Dr. Dunbar, demonstrates that "Local 3 contractors are at or close to market dominance" and that the practices at issue "pose a very real risk of producing a market where the only firms supplying telecommunications installation services are firms that use Local 3 workers". (Dunbar Report at 41–45).

### 5. *Damages*

After reaching the conclusion the plaintiff USIS has been injured by the anticompetitive practices of the defendants, Dr. Dunbar addressed the issue of damages. (Dunbar Report at 41–45). First, he identified the various sources of damages as follows: (1) occasions where USIS won the competition to provide telecommunications installation services, but subsequently lost the contract to a Local 3 contractor; (2) projects where USIS was not awarded a project even though it was the lowest bidder, with the project ultimately going to Local 3; (3) the loss of follow-up maintenance work on contracts USIS was not awarded; (4) costs incurred by USIS due to vandalism committed on projects where

USIS was providing the telecommunications installation services; (5) additional marketing, sales, and supervisory costs to "counter the impact on prospective customers and their advisors from the anti-competitive conduct of the defendants;" and (6) occasions where the plaintiffs were denied the opportunity to bid for projects given the customers' expectation that choosing a CWA contractor would result in vandalism and increased costs. (Dunbar Report at 41–42).

After identifying these sources, Dr. Dunbar estimated a range of damages using two approaches. The first model was based on parameters provided by USIS, while the second was based on statistical parameters. (Dunbar Report at 42).

Under the first approach, USIS identified 60 instances where it was the low bidder on a particular project but was not awarded the business, and five projects for which it won the bid but was subsequently removed. (Dunbar Report at 43). USIS's damages are the lost profits on these 65 projects, which Dr. Dunbar approximated to be $19.6 million. (Dunbar Report at 43 & Exh. VI–1). To this he added damages based on an estimate of associated maintenance work. Using a consulting report from the Building Services Research and Information Association ("BSRIA"), Dr. Dunbar estimated that maintenance work accounts for 25% of all cabling revenue. (Dunbar Report at 43). The lost revenue from this category of injury is therefore 25%[4] of the damages resulting directly from lost bids. (Dunbar Report at 43). Next, Dr. Dunbar simply added the costs incurred by USIS in repairing damage attributed to vandalism by Local 3 employees, a figure estimated by USIS to be $169,000. (Supplementary Responses of Plaintiff U.S. Information Systems, Inc. to

Defendants' Interrogatories dated July 22, 2002 ("Pl. Supp. Resp."), attached as Exh. 11 to Eilender Decl., at 3). Finally, USIS estimated its costs of counteracting anti-competitive behavior to be $750,000. (Pl. Supp. Resp. at 3). This provides a total of approximately $25.4 million in damages. (Dunbar Report at 44).

Under the second approach, Dr. Dunbar used the same basic framework as the first method, but he substituted "different values for increased revenues from change orders and gross profits." (Dunbar Report at 44). His analysis of change orders demonstrated that "on average they amounted to 15.6% of the originally awarded amount." (Dunbar Report at 44).

> The lost profit per dollar of revenue is estimated based on statistical cost estimation. The USIS financials divide almost all costs into two categories: cost of goods sold and SG & A (selling, general and administrative). Cost of goods sold is a variable cost but SG & A is generally considered to be a fixed cost in the short run. Over the long run, however, part of SG & A can increase with the scale of the enterprise. The variable portion of SG & A can be estimated using linear regression analysis.

(Dunbar Report at 44). In Exhibit VI–3 to his report, Dr. Dunbar utilized regression analysis to determine the portions of cost of goods sold and of SG & A that vary with revenues. The coefficients on revenues were interpreted to represent the amount of each dollar of revenue that goes to costs. (Dunbar Report at 44). Dr. Dunbar explained this statistical analysis of USIS's financial data as follows:

> [F]or every dollar received in revenue, $.70 is spent on costs of goods sold. Similarly, for every dollar received on

---

**4.** While Dr. Dunbar refers to this percentage in his report as both 20% and 25% (Dunbar Report at 43), his numerical calculations reflect a figure of 25%. (Dunbar Report, Exh. VI–1).

revenue (over a period longer than the short run), $.12 goes to increased SG & A. In the case of USIS, however, part of SG & A is actually profits because it includes the compensation to the principals. The third regression in Exhibit VI–3 shows that for every dollar of revenue, $.06 is paid to the principals in compensation. Consequently, the lost profits from a dollar of lost revenue would be $.24 (= $1—($.70 + $.12—$.06)).

(Dunbar Report at 44). According to Dr. Dunbar, the estimate of damages from this approach is $14.7 million. (Dunbar Report at 44).

Dr. Dunbar noted several issues that arise in calculating damages with respect to the final category, the occasions where the plaintiffs were denied an opportunity to bid. At the time his report was prepared, USIS had identified 19 projects which it claimed it had been improperly denied the opportunity to bid on, allegedly due to anticompetitive acts. Dr. Dunbar was able to ascertain the winning bid on only seven projects from the bid leveling documents; there were no data available on the other twelve. (Dunbar Report at 45). Dr. Dunbar also contended that there is "uncertainty about the rate at which USIS would have won the competitive bids if defendants had allowed a fair auction process." (Dunbar Report at 45). Although USIS was often the low bidder for the projects, there is "some possibility, however, that other CWA bidders would have also submitted bids in the same range as USIS creating competition for the winning bid." (Dunbar Report at 45). He therefore concluded that "[e]stimation of the damages from the final category is less clear-cut, but quantifiable if more data become available." (Dunbar Report at 45).

Dr. Dunbar revised several of his damages estimates in his rebuttal report in response to the report of Stephen W. Shulman, CPA, the defendants' damages expert. (Rebuttal Report of Frederick C. Dunbar, dated Dec. 17, 2002 ("Dunbar Reb. Report") at 25–26; Shulman Report at 12–19). Mr. Shulman provided a different damages estimate based on USIS's lost profits on projects it was unable to win because of the defendants' conduct. Taking into account certain items in Mr. Shulman's report, Dr. Dunbar re-estimated USIS's damages using a similar approach as was outlined in his first report, but with revised data. (Dunbar Reb. Report at 25). He performed a regression to "estimate the effect of changes in revenue on changes in direct, indirect and variable SG & A costs." (Dunbar Reb. Report at 25 & Exh. D3). He also conducted a regression analysis to "estimate the effect of changes in revenue on officers' compensation." (Dunbar Reb. Report at 25 & Exh. D3). Additionally, he revised the damage estimate downward based on the finding that the low bidder on a project would win the contract only 66.7 percent of the time, while second lowest bidder would win 25.9 percent of the time, the third lowest bidder 3.7 percent, and the fourth lowest bidder also 3.7 percent. (Dunbar Reb. Report at 25 & Exh. D4; Dunbar Decl., ¶ 47 & n. 32). Finally, Dr. Dunbar examined the damages USIS incurred due to projects where it was excluded from the bidding altogether.

*Discussion*

A witness qualified as an expert will be permitted to testify if his or her testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (quoting Fed.R.Evid. 702). To be admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The

proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 222 F.Supp.2d 423, 487 (S.D.N.Y.2002) (citing Fed.R.Evid. 104(a)).

In *Daubert,* the United States Supreme Court confirmed that the trial court should be a gatekeeper, preventing the jury from being overwhelmed by unsupportable speculation cloaked as "expertise." *Id.* at 596, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court elaborated, stating that *"Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." In construing *Daubert,* the Second Circuit has emphasized the discretion of the trial court:

> First, ... *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test "shaky but admissible" evidence,

and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995) (citation omitted).

In response to the Court's opinion in *Daubert* and decisions that followed, Rule 702 of the Federal Rules of Evidence was amended and now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[5]

The Advisory Committee Notes to the 2000 Amendments to Rule 702 declare that rejection of expert testimony is "the exception rather than the rule."

## A. *Relevance*

 As a threshold matter, it must be determined whether Dr. Dunbar's testimony is relevant to the issues involved in the litigation. Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or of the motivations of the parties. *See United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."); *United States v. Scop,* 846 F.2d

---

**5.** Even if admissible under Rule 702, expert testimony is still subject to exclusion under Rule 403 if "its probative value is substantially outweighed by the danger of unfair preju-

dice...." Fed R. Evid. 403; *see also United States v. Young,* 745 F.2d 733, 765 (2d Cir. 1984) (Newman, J., concurring).

135, 142 (2d Cir.1988), *rev'd in part on reh'g*, 856 F.2d 5 (2d Cir.1988). An expert's testimony must be helpful; it must "fit" with the issues to be resolved in the case. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786.

The defendants do not appear to dispute the relevance of Dr. Dunbar's testimony. His report certainly corresponds to the issues raised in the case and can be useful to the plaintiffs in making out their antitrust claims. Thus, there is no reason to exclude Dr. Dunbar's testimony on grounds of relevance.

### B. *Reliability*

■ It must next be determined whether Dr. Dunbar's testimony is reliable, that is, whether it is more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. An expert's testimony is admissible under Rule 702 as long as the processes or techniques that he used to formulate his opinions are reliable. *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786. Here, the defendants claim that Dr. Dunbar's testimony is unreliable based on his methods and the data to which he applies them. (Revised Memorandum of Law in Support of Defendants' Motion to Exclude the Testimony of Plaintiffs' Proposed Expert, Dr. Frederick C. Dunbar ("Def.Memo.") at 1). Although most of their arguments fail, the defendants are correct that Dr. Dunbar's opinion must be excluded insofar as it is predicated on an unreliable data sample.

### 1. *Qualifications*

As an initial matter, there is no basis in the record to challenge the qualifications of Dr. Dunbar. Dr. Dunbar is qualified as an expert witness in the field of economics and antitrust law given his extensive credentials, including his education, experi-

ence and general knowledge of the subject matter. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995) (allowing expert testimony and finding that defendant's "quibble" with the expert's qualifications was "properly explored on cross-examination").

### 2. *Methodology*

■ The defendants claim that Dr. Dunbar's testimony should be excluded since "the methodology he used to support his opinions is so deeply flawed that the opinions themselves are unreliable." (Reply Memorandum in Support of Defendants' Motion. ("Def. Reply Memo.") at 1). "In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.*, 179 F.Supp.2d 291, 301 (S.D.N.Y.2001); *see also Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that a trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique on which the expert relies has been tested—that is, whether the expert's technique can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted by the relevant scientific community. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. This list was meant to be "helpful, not

definitive," and a trial court has latitude in determining whether an expert's testimony is reliable. *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167.

The defendants offer several objections to Dr. Dunbar's methodology.

### a. *Unscientific Testimony*

The defendants allege that:

[Dr.] Dunbar did not use regression analysis or any other econometric technique in reaching his conclusions on liability. The only 'quantitative analysis' he performed ... is a straightforward arithmetic demonstration that bids which include Local 3 labor are, in general, higher than bids which include CWA labor—not surprising, given that CWA wages are about half as much as Local 3 wages.

(Def. Reply Memo. at 4). In responding to the defendants' contention that his testimony is unscientific, Dr. Dunbar claims that his methodology consisted of (1) statistical analysis of quantitative data and (2) application of economic theory to facts. (Dunbar Decl., ¶ 6). He goes on to detail the respects in which he conducted a statistical analysis and those in which he utilized economic theory.

Dr. Dunbar states that he performed a statistical analysis of bid prices and bid leveling data to "test plaintiff's market power hypothesis." (Dunbar Decl., ¶ 11; Dunbar Report, Exhs. V–1, V–2, V–3). In order to evaluate his hypothesis, Dr. Dunbar and plaintiffs' counsel sent out over 100 discovery requests to non-parties, including building owners and consultants. These requests yielded bid-leveling documents related to 75 separate projects spanning the time period from 1996 to 2002. (Dunbar Decl., ¶ 39). With these data, Dr. Dunbar conducted three separate analyses, the results of which are attached as Exhibits V–1, V–2, and V–3 to his original report. Exhibit V–1 lists all of the jobs among the 75 projects where a single firm submitted dual bids for the same project—one using Local 3 employees and the other using CWA employees. (Dunbar Report at 39). Dr. Dunbar found that in each case the Local 3 bid was higher by a simple average difference of 44% and a weighted average difference of 50%. (Dunbar Report, Exh. V–1). Exhibit V–2 compares the average bid prices of separate Local 3 and CWA contractors for the same jobs. There were 44 identified jobs, and for 43 of those, the average bid price for Local 3 contractors was higher than the average bid price of CWA contractors. Exhibit V–2 shows the difference between the bids for each job both in terms of a dollar amount and as a percentage. Dr. Dunbar concluded that "[o]verall, the data show that the prices bid by Local 3 installers are 41 percent higher than those bid by CWA installers." (Dunbar Report at 40). Finally, Exhibit V–3 identifies 11 jobs where Local 3 was awarded a contract even though a CWA contractor (USIS in all instances but one) submitted the lowest bid. Again, this exhibit shows the difference in both actual dollars and a percentage. Dr. Dunbar determined that the simple average differential between the bids was 36% and the weighted average differential was 22%. He asserts that the exhibits "show[ ] with virtual statistical certainty that defendant contractors have the ability profitably to maintain prices above competitive levels." (Dunbar Decl., ¶ 11). Dr. Dunbar states that these data show that "for those instances in which a CWA contractor was the low bid, but the contract was awarded to a Local 3 contractor, the customer paid on average 36% more than the low bid (22% more on a dollar weighted average)." (Dunbar Decl., ¶ 34). From these data, Dr. Dunbar concluded that "[o]n average telecommunications contractors employing Local 3 labor had significantly higher bids than telecommunica-

tion contractors employing CWA labor" and that "using Local 3 labor versus CWA labor causes substantial increase in prices." (Dunbar Report at 39–40). He found this differential to be statistically significant. (Plaintiffs' Response to the Court's Memorandum and Order dated Sept. 29, 2003 Re Daubert Hearing ("Pl. Daubert Resp.") at 4; Transcript of Daubert Hearing dated Dec. 5, 2003 ("Daubert Tr.") at 24, 26–28).

Contrary to the defendants' assertion, the value of Dr. Dunbar's analysis is not limited to the calculation of the bid differentials, but also includes the inferences an economist would draw from the facts in the record concerning the nature of the market.[6] Dr. Dunbar went on to apply "textbook economic theory" to this information, concluding from the facts in the record that the economic indicators of market dominance in electrical installation, market distinctions between electrical and telecommunications installation, and anticompetitive conduct are present in this case. (Dunbar Decl., ¶ 12). Whether this is an appropriate inference to be drawn from the data is a question that is certainly open to dispute. The defendants are fully able, however, to contest this inference both through the testimony of their own expert witnesses, (e.g., Ashenfelter/Farber Report at 43–45) and through cross-examination of Dr. Dunbar.

■ The fact that the defendants' experts would draw contrary inferences from the same data does not render either expert's testimony inadmissible, nor does it speak to the reliability of the methodology. "When a trial court ... rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." *In re Blech Securities Litigation,* No. 94 Civ. 7696, 2003 WL 1610775, at *20 (S.D.N.Y. March 26, 2003) (quoting Fed.R.Evid. 702, Advisory Committee Notes to 2000 Amendments); *see In re Rationis Enterprises, Inc. of Panama,* No. 97 Civ. 9052, 2003 WL 203210, at *2 (S.D.N.Y. Jan.20, 2003) (refusing to exclude plaintiffs' expert testimony merely because defendants' expert reached different conclusions). There is no single, established methodology for determining whether the relevant market reflects evidence of anticompetitive behavior, and Dr. Dunbar's report has a "traceable, analytical basis in objective fact." *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 522 (S.D.N.Y.2001) (quoting *Bragdon v. Abbott,* 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)), *amended in part on reconsideration,* 137 F.Supp.2d 438 (S.D.N.Y.2001). The statistical analysis that Dr. Dunbar conducted may not be as complex as the multiple regression analysis utilized in cases cited by the defendants, *see, e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1238, (3d Cir.1993), but the value of Dr. Dunbar's testimony is found largely in his interpretation of the data.

b. *Flawed Market Share Analysis*

■ The defendants also challenge Dr. Dunbar's methodology in analyzing market share. (Def. Memo. at 6). In his rebuttal report, Dr. Dunbar alludes to Exhibit 5 of the report by Professors Ashenfelter/Far-

---

6. The plaintiffs also explain how Dr. Dunbar used regression analysis in calculating damages. They state that "Dr. Dunbar started with a given on the claimed lost jobs, i.e., the revenue based on the bid price. What he did not know for each job—because it was not awarded— was the costs which would have been incurred and is necessary to compute the net profit." The regression analysis was a correlation between "USIS revenues and costs on other actual projects so that [Dr. Dunbar] could determine the best estimate of costs to be used for each lost job." (Pl. Daubert Resp. at 8).

ber, the defendants' expert witnesses. He states that:

> As can be seen in Exhibit 5 to the report of Professors Ashenfelter and Farber, market shares have been relatively stable over the five years of data that are provided. If firms were competing aggressively for multimillion dollar contracts, it would not be surprising to see large swings in market share, because the contractors can, in effect, rent labor through the hiring hall. This flexibility allows labor to move relatively easily from one firm to another making large swings in market share possible. The stability of market shares in electrical contracting is consistent with noncompetitive explanations.

(Dunbar Reb. Report at 20). The defendants' experts contend that contrary to this conclusion, the "market shares of Local 3 contractors have shown considerable variability." (Rubuttal Report of Orley C. Ashenfelter and Henry S. Farber dated Jan. 17, 2003 ("Ashenfelter/Farber Reb. Report") at 2). Referencing economic literature on the issue by Kenneth G. Elzinga and Neil H. Jacoby, Professors Ashenfelter and Farber stated in their report that:

> [S]table market shares may provide some indication that an industry has been cartelized or that it may behave in some other anticompetitive way. Although no firm benchmark exists, in his multi-industry study Jacoby finds that a coefficient of variation of 7% to 15% appears normal. Elzinga uses Jacoby's results as a norm for industries where there is no anticompetitive behavior. He also analyzes industries where there

was known cartelization and shows that the coefficient of variation of market shares was below the range identified by Jacoby in these industries.... [T]he coefficient of variation in the share of total wages (wage shares) for firms that employ Local 3 labor ... vary from 6.3% to 39.2% ... and only one coefficient out of nine ... falls below 7%. The average coefficient is 19.7% ... [which does] not support Dr. Dunbar's conclusion that these data are "consistent with noncompetitive explanations."

(Ashenfelter/Farber Reb. Report at 2–3). The defendants claim that because Dr. Dunbar's analysis did not consider the "Jacoby/Elzinga Theory," he "did not take into account the standard economic theory," thus revealing a flaw in his methodology. (Def. Memo. at 7).[7] Dr. Dunbar responded to this claim, stating:

> The industries studied by Dr. Jacoby are relatively concentrated. Consequently, the largest firms collectively account for relatively high shares. It can be seen that the co-defendants and co-conspirators in the electrical contracting market in Local 3's jurisdiction have a collective share that is less than that of the largest firms in Dr. Jacoby's sample of industries, yet their share stability is about the same. When we include the firms included in Exhibit 5 of the [Ahenfelter/Farber Report], the industry share is closer to those in the Jacoby study and the coefficient of variation is much less. Moreover, as I explained in my report, economists would expect the stability of shares to depend on the characteristics of the industry. Electrical contracting would be an industry in

---

**7.** There is no single "Jacoby/Elzinga Theory." Rather, the Ashenfelter/Farber Rebuttal Report cites to separate publications by Neil H. Jacoby and Kenneth G. Elzinga. (Ashenfelter/Farber Reb. Report at 2 nn. 2, 3) (citing Neil H. Jacoby, *Relative Stability of Market*

*Shares: Theory and Evidence from Several Industries*, 12 J. of Industrial Economics 82 (1964); Kenneth G. Elzinga, *New Developments on the Cartel Front*, The Antitrust Bulletin, Spring 1984; at 3–26).

which one would expect shares to fluctuate dramatically. (Dunbar Decl., ¶¶ 31, 32). Thus, Dr. Dunbar has not ignored the studies by Drs. Jacoby and Elzinga. Rather, he acknowledges these studies and describes how their work actually supports his conclusions. This is therefore not a flaw in Dr. Dunbar's methodology. To the extent that the defendants disagree with the conclusions Dr. Dunbar reaches, their experts can testify about the contrary interpretation, and they can challenge Dr. Dunbar's conclusions on cross-examination.

### c. *Data Sample*

The next, and ultimately most compelling, objection the defendants make to Dr. Dunbar's methodology is that his report was based on a "skewed data set." (Def. Memo. at 7). The defendants claim that the data sample is unreliable based both on the sample size and how the sample was selected.

In order to generate data for Dr. Dunbar to use, the plaintiffs compiled a list of many different entities that would be likely to have records with information on projects bid with CWA labor during the relevant time period. These sources included information technology consultants, customers believed to have been involved in projects of this type, general contractors with experience in the field, building owners, electrical and telecommunications contractors, and various federal and state agencies. (Declaration of Richard A. Cirillo dated Dec. 22, 2003 ("Cirillo Decl."), ¶ 2). The plaintiffs wanted to obtain the "broadest available range of information bearing on the defendants' efforts (1) to exclude the plaintiffs from being allowed to bid on telecommunications installation projects, (2) to prevent projects from being awarded to the plaintiffs, (3) to cause projects awarded to the plaintiffs to be reassigned to Local 3 affiliated contractors, and (4) to raise the plaintiffs' costs, thereby making them less competitive and depriving them of profits." (Cirillo Decl., ¶ 1).

Initially, the plaintiffs claim they sought "unlimited discovery," while the defendants attempted to circumscribe the scope of discovery to "a limited number of particular projects, arguing that discovery should be permitted only as to a few projects or only to the projects listed in the complaint." (Cirillo Decl., ¶¶ 4–5). Judge Berman ultimately permitted only limited discovery, and accordingly, discovery requests were initially sent to 75 entities. (Cirillo Decl., ¶¶ 4–5). The responses from these requests were of little use to the plaintiffs. "The responses from the approximately 75 initial subpoena recipients ranged from a denial that they had any documents at all or a refusal to cooperate, to expressed concern that responding to the subpoenas would result in retaliation from the defendants against the responding entity." (Cirillo Decl., ¶ 5).

Following this disappointing response, the plaintiffs prepared a second set of subpoenas to serve on additional entities. In contrast to the first set of discovery requests, the subsequent subpoenas "were more focused on the particular projects to which, at the defendants' insistence, the plaintiffs' damages (but not equitable relief) claims were to relate in this lawsuit." (Cirillo Decl., ¶ 7). This second set of subpoenas was sent out in two waves. While information about the same projects was sought in both waves, the subpoenas were sent to different entities. (Cirillo Decl., Exhs. C, D, E, F). The responses the plaintiffs received from both sets of subpoenas were made available to Dr. Dunbar and his staff. It is on this information that Dr. Dunbar based his report. (Cirillo Decl., ¶ 8). Dr. Dunbar separated the information he received from the plaintiffs into two different categories. The

first was comprised of information provided by USIS relating to all bids that it submitted during the relevant period, whether won or lost, including the dollar value of each bid. This category had no information about competing bids for a project; it consisted only of information about USIS's own bids and whether it won or lost the project. (Dunbar Decl., ¶ 39). The second category contained "hard copies of bid-leveling documents that IT consultants and other customers produced during discovery." (Dunbar Decl., ¶ 39).

#### (i) Sample Size

■ The defendants claim that Dr. Dunbar based his opinion on only 60 to 90 of the thousands of telecommunications installation jobs that USIS bid during the relevant time period. (Def. Memo. at 7).[8] Accordingly, the defendants allege that Dr. Dunbar was working with an insufficiently representative data sample. According to the defendants, this caused "at least two manifestly flawed and unreliable analyses, and therefore flawed conclusions." (Def. Memo. at 7). First, by ignoring the "thousands of projects that USIS and other CWA contractors won," he miscalculated the probability that the defendants would monopolize the telecommunications industry. (Def. Memo. at 8). Second, he relied on the same insufficient sample in concluding that there were anticompetitive effects on the market. (Def. Memo. at 8).

■ As long as a sample is representative—that is, it was not selected in a biased manner—sample size will not skew the results of the analysis. It will have an effect on whether the results are significant, i.e., whether the analyst can be confident that a perceived difference is

due to the factor being studied rather than to chance. Put another way, "[d]iscerning subtle differences in the population requires large samples; even so, small samples may detect truly substantial differences." Federal Judicial Center, *Reference Manual on Scientific Evidence* 126 (2d ed.2000). Whether the results are significant can be tested, as Dr. Dunbar did here, using measures such as the t-statistic. *Id.* at 175; (Daubert Tr. at 22–25). Accordingly, small sample size goes to the weight rather than to the reliability (and admissibility) of a study. *See McCullock*, 61 F.3d at 1044 (faults in use of methodology go to weight, not admissibility); *Playtex Products, Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046, 2003 WL 21242769, at *2–3 (S.D.N.Y. May 28, 2003) (errors in survey went to weight, not admissibility); *A & M Records, Inc. v. Napster Inc.*, No. C9905183MHP, 2000 WL 1170106, at *3–4 (N.D.Cal. Aug.10, 2000) (error in identifying universe of target population did not affect admissibility of expert's testimony). Thus, despite the potential effect the small sample size could have on the persuasiveness of Dr. Dunbar's conclusions, his testimony is not inadmissible solely based on sample size alone.

#### (ii) Sample Selection

■ The defendants also claim that the selection of the sample was biased. (Def. Memo. at 7). They argue that the projects identified and used by the plaintiffs are "a biased sample chosen by Plaintiffs precisely because they were projects Plaintiffs lost—a selection criterion that assured an unrepresentative database from which to draw conclusions." (Def. Reply Memo. at

---

**8.** The plaintiffs explain that although this database did contain information on "thousands" of jobs bid by USIS during the time period, the entire population of those jobs was of limited use. According to them, "fully

85% of [the jobs] were either *outside* the relevant seven county geographic market covered by this case or were *below* the $50,000 threshold selected as the basis for evaluating damages in this case." (Pl. Daubert Resp. at 6).

7). The defendants fault Dr. Dunbar for not basing "his conclusions on a random sample that would yield an unbiased data set." (Def. Memo. at 7). Specifically, the defendants assert that "75% of the subpoena recipients selected by Plaintiffs' counsel were associated with projects named in the Complaint or on a list of projects on which Plaintiffs alleged they were damaged" (the "Selected Projects"), and that "50% of all subpoena recipients were asked only for documents regarding those Selected Projects or some subset thereof." (Letter from Kevin J. Toner dated Jan. 23, 2004 ("Toner Letter") at 1).[9] Because the data sample was "chosen by Plaintiffs' lawyers and biased toward projects where lead plaintiff [USIS] was known to have been the lowest bidder but did not win the job," the defendants maintain that the sample was "neither random nor representative." (Toner Letter at 2).

Most statistical analyses pertinent to judicial proceedings, and certainly those dealing with economic and antitrust issues, are not based on randomized controlled experiments. Rather they are observational studies grounded in real world data. *See Reference Manual on Scientific Evidence, supra,* at 94–95. Consequently, they cannot be held to the same rigid standards of scientific precision. Nevertheless, the reliability of any analysis depends upon an unbiased selection of sample data. As Dr. Dunbar testified:

> Basically, the necessary condition is that the sample that you use or observe is not selected on the basis of the variable at issue. The variable at issue here is price. And as long as the selection of the sample isn't really related to price or

a variable related to price in such a way that it biases your results, then you can perform a perfectly adequate hypothesis test or use that for statistical inference. (Daubert Tr. at 16). Yet, the plaintiffs are unable to establish that the data set utilized by Dr. Dunbar was unbiased.

In the second set of subpoenas, the plaintiffs designated a list of 103 projects that were related specifically to their damages claims. (Cirillo Decl., ¶ 7; Toner Letter at 3). While this was done according to the desires of the defendants to limit discovery and Judge Berman's resulting order, its effect was ultimately to taint the resulting data sample. By allowing the projects listed in the subpoena to be selected on the basis of the plaintiffs' damages claims, the data sample would necessarily contain projects where the plaintiffs believed they had either been unfairly kept out of the bidding process or wrongfully denied the award. This is precisely a selection of data based on price, since the unfairness that the plaintiffs suspected was that their bid was materially lower than that of a contractor using Local 3 labor, but that they nevertheless lost the contract.

This selection process is closely analogous to that which proved fatal to the proposed expert evidence in *Rowe Entertainment, Inc. v. William Morris Agency, Inc.,* No. 98 Civ. 8272, 2003 WL 22124991, at *3 (S.D.N.Y. Sept.15, 2003). There, the expert concluded that black concert promoters were underutilized by the defendant booking agencies due to race discrimination. The expert based his study on a sample of 1,561 contracts. Of those con-

---

9. The defendants also claim that there was selection bias in the first wave of subpoenas. The defendants assert that of the first round of subpoena recipients, 36 were "owners or owner's representatives associated with the projects Plaintiffs named in the Complaint."

(Toner Letter at 5). Accordingly, the defendants maintain that "[t]hese entities likely would have only documents relating only to their own projects, and their selection thus introduced further bias." (Toner Letter at 5).

tracts, however, 1,214 were selected by plaintiffs and plaintiffs' counsel out of a possible 100,000 which were produced by the defendant agencies. The expert in *Rowe* argued that since the plaintiffs were "unaware of how he would conduct his analysis when they selected the contracts, they would not know how to create a biased group of contracts." *Id.* at *2. However, the plaintiffs' counsel testified that, at least in part, the contracts had been selected because they involved specific artists named in the Amended Complaint. *Id.* at *3. The court found that since the contracts were selected on this basis, the sample the expert received was neither "random nor representative." *Id.* "Instead, the sample would, perforce, be biased or weighted towards the concert contracts for those artists whose business Plaintiffs wanted but did not get." *Id.* Because over three-quarters of the expert's sample would not be representative, the court held that the entire sample was unrepresentative.

The analysis here was similarly flawed. Although Dr. Dunbar did not make a selection among the data made available to him, those data were already a sample of the universe of telecommunications projects chosen by means of the discovery process. And, as discussed above, that process was systematically biased to select projects with the very price differential that Dr. Dunbar's analysis was designed to test for.

On February 18, 2004, plaintiffs' counsel submitted an unsolicited letter presenting further arguments in support of their position. (Letter of Maxwell M. Blecher dated Feb. 18, 2004 ("Blecher Letter")). Since briefing on the Daubert motion had long since been closed, this submission was untimely. Nevertheless, because of the importance of Dr. Dunbar's testimony to the outcome of this case, I have considered the plaintiffs' additional arguments. Most com-

pelling is Dr. Dunbar's contention that while the data selection process necessarily chose projects in which the bid price for the contractor using Local 3 labor was lower than that for the contractor employing CWA members, there is no evidence that the sample would be unrepresentative with respect to the price *differential:*

> [N]obody involved in the process of selecting the subpoenas attempted to select projects for which the USIS price was lower relative to a Local 3 bidder than was the case for projects not selected. [Defendants' counsel's] argument that the projects listed in the complaint (from which many, but not all, of the bid leveling documents derive) is based on the belief that USIS was the low, but unsuccessful bidder is irrelevant; that thought process does not result in selecting bid leveling documents which enhanced the price difference. As even defendants' experts attest, it would be expected that any CWA subcontractor would have a lower bid than any Local 3 subcontractor. But there is no evidence that projects were dropped from the sample selection process because the difference in a Local 3 contractor price and a CWA contractor price was closer than was the case for those projects that were selected.

(Declaration of Frederick C. Dunbar dated Feb. 17, 2004, attached as Exh. 1 to Blecher Letter, ¶ 8).

I am not persuaded. Even though, as Dr. Dunbar observes, Local 3 contractors will always have higher bids than CWA contractors, it can certainly be inferred that the projects identified in the Complaint were the most egregious examples and were likely to reflect a greater price differential. As plaintiffs' counsel acknowledged, "we did start out with the projects [where] we know there had been activity of the type that is described in the

complaint[.]" (Daubert Tr. at 11). It is unrealistic simply to assume that bid leveling documents chosen in this manner would have the same average price differential as those for projects where the plaintiffs had not felt so aggrieved.

Finally, Dr. Dunbar performed no analysis that might rebut the finding of apparent bias. He did not, for example, compare the price differential for projects identified in the first round of subpoenas, which apparently were more representative, with those in the second round, which was infected by the selection criteria. If the price differential between the two groups were substantially the same, then an argument could be made that the selection process had no impact on the fairness of the sample. But no such sensitivity testing was conducted.

As the proponents of the expert, it is the plaintiffs' burden to demonstrate the reliability of his data. Here, the plaintiffs have not met that burden, and Dr. Dunbar's data sample therefore cannot provide the basis for his testimony. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.

d. *Inconsistent Application of Methodology*

■ The defendants also object to Dr. Dunbar's methodology by claiming that he applied his own methodology inconsistently by "disregard[ing] his stated methodology when it did not suit Plaintiffs' ends." (Def. Memo. at 9). They claim that Dr. Dunbar's opinions are "one-sided interpretations of the available data," and as such are inadmissible under Rule 702. (Def. Reply Memo. at 5). The defendants identify several examples of this alleged inconsistency. First, they state that Dr. Dunbar "claimed to credit documentary evidence over testimonial evidence," but did so only when "the 'preferred' evidence did not contradict the conclusion he wished to reach." (Def. Memo. at 9). In

support of this, they point to the section of Dr. Dunbar's rebuttal report describing an incident where one of the defendant contractor's alleged acts of vandalism helped it obtain a job for McGraw–Hill that USIS had also sought. (Def. Memo. at 9; Dunbar Reb. Report at 11). The defendants claim that Dr. Dunbar came to this conclusion despite a letter from McGraw–Hill's Vice President of Real Estate Services stating that McGraw–Hill had "no knowledge of any threats or intimidation that were made against this Company or any one of its contractors, and certainly none that had any influence on the bid process." (Def. Memo. at 9). The defendants assert that Dr. Dunbar instead relied on the deposition testimony of USIS principal John Lagana. (Def. Memo. at 9; Dunbar Reb. Report at 11). In his deposition, Dr. Dunbar explained his conclusion, stating that he gave the McGraw–Hill letter "less credibility ... than other evidence which reveals what actually happened." (Deposition of Frederick C. Dunbar dated December 30, 2002, attached as Exh. 16 to Eilender Decl.; at 55). In response, the plaintiffs state that Dr. Dunbar "was not ignorant of [the McGraw–Hill letter], but knew of it and assessed its significance and limitations." (Plaintiffs' Opposition to Defendants' Motion ("Pl.Memo.") at 19).

■ Although it is possible that Dr. Dunbar placed undue weight on the deposition testimony over the McGraw–Hill letter, this in itself does not necessitate the exclusion of his testimony. While an expert should address evidence that contradicts his conclusions, "[i]t is not required ... that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Astra Aktiebolag*, 222 F.Supp.2d at 488. Dr. Dunbar admits that "[o]ne of the purposes of my report is to

explain to the trier of fact the economic conclusions that would be contingent on their findings regarding the conduct at issue." (Dunbar Decl., ¶ 43). The finder of fact in this case will make determinations about what did or did not occur. The defendants' objections to purported inconsistencies in Dr. Dunbar's methodology go to the weight, not the admissibility of his testimony. *Zuchowicz v. United States,* 140 F.3d 381, 386 (2d Cir.1998) (citing *McCullock,* 61 F.3d at 1044).

### e. *Improper Reliance on Deposition Testimony*

 The defendants next urge the exclusion of Dr. Dunbar's testimony on the ground that "[t]here was no economics or science to [Dr.] Dunbar's analysis; he simply read parts of the record, then reached a verdict." (Def. Memo. at 6). The defendants allege that Dr. Dunbar's testimony would relate to "non-technical matters" that the jury would be fully capable of understanding without his testimony. (Def. Memo. at 6).

 While the defendants are undoubtedly correct in their contention that "[a]n expert must do more than sift through nontechnical evidence and tell the jury how to decide the case" (Def. Memo. at 5–6), Dr. Dunbar's report could certainly aid the jurors by helping them understand the basic economic principles of market power, the concept of distinct markets, and other economic intricacies this case involves.

The defendants cite to *Primavera,* 130 F.Supp.2d at 529–30, as support for the exclusion of expert testimony for failure to assist the trier of fact. (Def. Memo. at 5–6). In *Primavera,* the defendants sought to exclude the testimony of three experts. The court allowed two of the experts to testify but precluded the third, finding that he merely offered "credentials rather than analysis." *Id.* at 529 (*quoting Minasian v.*

*Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.1997)). The expert in *Primavera* was asked to examine whether the defendants had complied with the terms of a contract, adhered to the covenant of good faith and fair dealing, and conducted certain transactions in a commercially reasonable manner. *Id.* at 528. The court found that the expert's initial assignment was "flawed from the outset" because "[r]ather than being asked to develop an expert opinion that might happen to embrace certain ultimate issues, he was asked to reach legal conclusions regarding those ultimate issues." *Id.* at 528. The court found that the expert supported his opinions by relying "almost exclusively on his interpretation of deposition testimony by witnesses in this case. In so doing, he does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury interpreting the evidence." *Id.* at 529.

Here, although much of Dr. Dunbar's report does rely on deposition testimony of various parties, he has not merely assumed the role of counsel. Rather, he has applied his expertise to the facts of the case, and drawn conclusions from those facts. He first utilizes deposition testimony to provide background information on the nature of the electrical installation market. He cites to the deposition testimony of Raymond Melville, the assistant business manager for construction for Local 3, in order to explain the role of the JIB in controlling the allocation of supply of electricians. (Dunbar Report at 9). He also refers to the declarations of Richard Ryan, a member of the IBEW, and David Kaliff, an information technology consultant, to provide information on the importance of unions in supplying labor for electrical installation in large commercial projects. (Dunbar Report at 13 & n. 24). Similarly, Dr. Dunbar refers to several depositions in

the section of his report describing the market for telecommunications installation. He cites the testimony of three different telecommunications consultants to provide information on the type of training and certification needed to perform telecommunications installation. (Dunbar Report at 18–21). He relies on the deposition testimony of several representatives of the contractor defendants to further support his assertion that the market for telecommunications installation is distinct from the market for electrical installation. (Dunbar Report at 24). Finally, Dr. Dunbar cites the deposition testimony of customers, consultants, and union representatives describing certain incidents where Local 3 workers refused to work overtime and certain acts of vandalism that occurred during the relevant time period. (Dunbar Report at 25–34).

█ Although Dr. Dunbar does rely heavily on these depositions, he does so primarily to provide background information. It is well settled that an expert is free to offer testimony to provide a background for the case. *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir.2001); *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). If Dr. Dunbar's report consisted only of that background information, the defendants would certainly be correct in their assertion that it is unnecessary for an expert to testify about those depositions. Dr. Dunbar, however, uses the information in the depositions to describe the setting in which the parties were operating. From there, he applies economic principles to determine whether the situation described was one that tended to show economic indicators of market dominance and monopoly leveraging. (Dunbar Report at 4–34). Dr. Dunbar's testimony

does not consist of "conclusions ... offered without benefit of citation to research, studies, or other generally accepted support for expert testimony." *Primavera*, 130 F.Supp.2d at 529. Rather, his ultimate conclusions are based on the application of "standard economic methodology" to the facts at hand. In order to reach those ultimate conclusions, it is permissible for Dr. Dunbar to rely on deposition testimony.

### 4. *Alternative Explanations*

█ The defendants further contest the admissibility of Dr. Dunbar's testimony because he "fails to account for obvious alternative explanations for the conclusions expressed." (Def. Memo. at 10). The defendants assert that "the most obvious alternative explanation for everything [Dr. Dunbar] deems conspiratorial conduct" is that such conduct "was the result of Local 3 members acting independently to preserve their work." (Def. Memo. at 11). The defendants attribute the "handful of incidents of 'misconduct' that [Dr.] Dunbar relied upon to construct his conspiracy theory" on a longstanding conflict between Local 3 members and CWA members over CWA members' willingness to work for lower wages. (Def. Memo. at 11–12). The defendants thus claim that any of the acts Dr. Dunbar found to be conspiratorial are simply the product of animosity between workers of the two unions. Additionally, the defendants suggest that "[Dr.] Dunbar reached the liability opinions set forth in his initial Report without considering his own conclusion that the lowest bidder loses a job fully one-third of the time even absent any interference, and the undisputed fact that general contractors do not base their hiring decisions solely on price." (Def. Memo. at 12). Moreover, the defendants also contend that Dr. Dunbar "ignored the evidence that on a large job, hiring the same contractor to do both the

electrical and telecommunications work makes it easier to complete both projects." (Def. Memo. at 12).

In response, the plaintiffs claim that Dr. Dunbar "considered [the defendants'] hypothesis" but ultimately rejected it, reasoning that "the effects in the market would not have been possible without coordination, condonation, encouragement and enforcement" by Local 3 as the members' union and by the contractors as the members' employers. (Pl. Memo. at 18; Dunbar Report at 25–29). In his Rebuttal Report, Dr. Dunbar addresses the conduct he finds to be inconsistent with the possibility that the defendants acted independently:

> [T]he Defendants' experts' claim—that electrical contractors acting independently would threaten labor problems to win business from CWA employers—does not make sense if the electrical subcontractor carrying the threats would not get the contract for the telecommunications installation. History shows, however, instances in which threats were carried by Local 3 employers who would not be the winning bidder on the telecommunications installation contract. Such contractors did not stand to gain directly by the job going to a non-CWA contractor. The benefits accrue to a different Local 3 telecom contractor and to Local 3 members.

(Dunbar Reb. Report at 9). Dr. Dunbar then goes on to describe five incidents where the behavior of one Local 3 employer engaging in conduct such as threatening not to work overtime actually benefitted a competing Local 3 employer. He asserts that these are examples of behavior that is inconsistent with independent action by Local 3 or its members. (Dunbar Reb. Report at 10–12; Deposition of Frederick C. Dunbar dated December 31, 2002, attached as Exh. 17 to Eilander Decl., at 341). Dr. Dunbar to describes circum-

stances where Local 3 officials "intervene[d] to take business away from USIS." (Dunbar Reb. Report at 15–17). Additionally, he rebuts the defendants' proposed theory by pointing out the potential that Local 3 utilized facilitating devices such as the JIB to influence the bidding process. (Dunbar Reb. Report at 16).

 An expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable. *See Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 502 (9th Cir.1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiffs' injuries); *cf. Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C.Cir.1996) (possibility of some un-eliminated causes presents question of weight, so long as most obvious causes have been considered and reasonably ruled out by expert); *Royal Insurance Co. of America v. Joseph Daniel Construction, Inc.*, 208 F.Supp.2d 423, 427–28 (S.D.N.Y.2002). Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious causes. An expert is not required, however, to categorically exclude each and every possible alternative cause. *See Astra Aktiebolag*, 222 F.Supp.2d at 488.

In this case, Dr. Dunbar addressed the defendants' alternative theories of the case, and ultimately found them to be unpersuasive. The defendants cite to cases such as *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), to support the proposition that an antitrust plaintiff must demonstrate that alternative, non-conspiratorial explanations for behavior are not equally likely. (Def. Reply Memo. at 6). Although this is certainly true, it does not necessarily speak to the admissibility of Dr. Dunbar's opinion. In order for Dr. Dunbar's testimony to be

admissible, he need only demonstrate that he has "adequately accounted" for alternative explanations; he does not need to prove that his opinions are in fact more likely than the suggested alternatives. *See* Fed.R.Evid. 702, Advisory Committee Notes to 2000 Amendments. If at trial the defendants can persuade the finder of fact that other explanations are equally likely, then they should certainly prevail. However, the possibility of some un-eliminated causes does not render Dr. Dunbar's testimony unreliable.

\* \* \* \* \* \*

▋ Dr. Dunbar's analysis satisfies the *Daubert* standards for reliability in many respects. As an expert in antitrust economics, he utilized recognized, scientific methods to analyze the monopoly leveraging claims in this case. Some of his findings, such as those related to damages,[10] are independent of the flawed data collection process and therefore remain admissible. However, to the extent that any of Dr. Dunbar's conclusions concerning liability are based on the skewed data sample, they do not meet the *Daubert* requirements and are thus inadmissible. If the plaintiffs believe that Dr. Dunbar will be able to offer relevant expert testimony after excising those parts of his analysis that rely on the biased data, they must proffer a revised expert report.

## C. *Embedded Legal Conclusions*

▋ In addition to objections about Dr. Dunbar's methodology, the defendants claim that Dr. Dunbar's reports and testimony are "replete with conclusions about the existence of a conspiracy based upon conclusions of law that are indefensible and outside the realm of [his] expertise." (Def. Memo. at 16). The defendants allege that "[Dr.] Dunbar is acting as an advocate rather than economist." (Def. Memo. at 23). The plaintiffs respond by asserting that "[c]oncerted action is a concept with which economists deal in their discipline" and therefore it is "commonplace that economic analysis extends to distinguishing concerted or collaborative behavior from individual or unilateral behavior in a market." (Pl. Memo. at 23; Dunbar Decl., ¶ 26). The plaintiffs assert that Dr. Dunbar's testimony would explain "the economics of the concerted action claim," including "[t]he competitive significance of parallel behavior, motive and opportunity, facilitating devices, communications ability, and behavior inconsistent with independent action in a competitive market." (Pl. Memo. at 24). Moreover, the plaintiffs contend that any confusion could be dispelled at trial through the type of questions the attorneys would ask.

▋ It is inappropriate for an expert provide legal conclusions. "Although an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts.'" *Media Sport & Arts s.r.L. v. Kinney Shoe Corp.*, at No. 95 Civ. 3901, 1999 WL 946354, at \*1 (S.D.N.Y. Oct.19, 1999) (quoting *United States v. Bilzerian*, 926

---

**10.** The defendants argue that Dr. Dunbar overstated damages by taking the percentage of cases in which the low bidder would be expected to win the contract (67%) and applying it only to the projects that USIS lost. (Def. Reply Memo. at 9–10 & n. 14; Toner Letter at 5 n. 4). But the defendants apparently misapprehended Dr. Dunbar's analysis. Because this is a damage calculation, he necessarily starts with the universe of projects on which USIS was the low bidder but which it nevertheless lost; no damages would be awarded in connection with projects that it won. He then calculates the net profit that USIS would have made on the lost projects and discounts it by 33 percent to reflect the fact that even in a competitive market, the low bidder would win the contract only 67 percent of the time. Though the accuracy of Dr. Dunbar's figures may be open to dispute, his methodology with respect to damages is sound.

F.2d 1285, 1294 (2d Cir.1991)). Although courts generally permit expert testimony concerning mixed questions of fact and law, the determination of purely legal issues is the exclusive purview of the court. Thus, expert testimony that merely states a legal conclusion must be excluded. *See Andrews v. Metro North Commuter Railroad Co.,* 882 F.2d 705, 709–10 (2d Cir. 1989) (holding that it was reversible error to allow a forensic engineer to testify that "the railroad was negligent"); *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1256, 1258 (2d Cir.1987) (district court properly excluded testimony of attorney expert witness that contracts at issue were unenforceable because they lacked essential terms). This is the case because "[e]xpert evidence should not be permitted to 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Primavera,* 130 F.Supp.2d at 528 (quoting *GST Telecommunications, Inc. v. Irwin,* 192 F.R.D. 109, 110 (S.D.N.Y.2000)). The issue here is thus whether Dr. Dunbar's report contains embedded legal conclusions, or simply identifies factors, the existence of which would tend to indicate a conspiracy.

Economists often explain whether conduct is indicative of collusion. For example, courts have held that an expert is permitted to testify that the "climate" of a specific market was consistent with a conspiracy. *In re Polypropylene Carpet Antitrust Litigation,* 93 F.Supp.2d 1348, 1355 (N.D.Ga.2000) (denying in part defendants' motion to exclude plaintiffs' expert testimony because the expert's proposed testimony "that the climate of the polypropylene market during the relevant time period was consistent with a finding that Defendants engaged in a conspiracy to fix prices" would be "helpful to the trier of fact"); *Re/Max International, Inc. v. Realty One, Inc.,* 173 F.3d 995, 1003, 1010–11

(6th Cir.1999) (expert economist, after describing conditions in respective markets, opportunities for collusion, evidence pointing to collusion, terms of certain undisputed agreements, and market behavior, expressed opinion that there was concert of action consistent with plaintiff's conspiracy theory). *But cf. City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 565 (11th Cir.1998) (finding an expert witness' "characterizations of documentary evidence as reflective of collusion, and his characterizations of particular bids as 'signals,'" not appropriate for expert testimony). The distinction between a legal conclusion and appropriate expert testimony is "extremely fine and courts faced with determining whether an expert's opinion goes too far are often forced to recite a slew of case law in an attempt to determine where the line should be drawn." *TC Systems Inc. v. Town of Colonie,* 213 F.Supp.2d 171, 181 (N.D.N.Y.2002).

In their responsive briefs, the plaintiffs suggest a "compromise" similar to the approach taken by the Honorable Shira A. Scheindlin in *Union Carbide Corp. v. Montell N.V.* 28 F.Supp.2d 833 (S.D.N.Y.1998). In that case, Judge Scheindlin held that the plaintiff's experts would not be permitted to testify as to their legal conclusion that the defendant's conduct was "anticompetitive" or "unlawful." *Id.* at 843. The experts could, however, testify that the market was "'not competitive' and to explain how they reach[ed] that conclusion." *Id.* This approach seems applicable to the facts here as well. Using this model, Dr. Dunbar would not be permitted to state that the defendants did or did not engage in anticompetitive conduct. He could, however, point to factors that would tend to show anticompetitive conduct in a market. He could then indicate whether he believed those factors existed here, and what the economic significance of those factors would be. He could also explain

how certain conduct could affect a market through the use of hypothetical statements. Recognizing that the ultimate determination of what did or did not happen in this case is left to the finder of fact, Dr. Dunbar could hypothesize that if certain conduct did occur, economists would expect the market to react in a particular way. This is different from reaching the ultimate legal conclusion about whether a conspiracy existed or anticompetitive conduct actually occurred. Those determinations are the province of the trier of fact. *See Blech Securities,* 2003 WL 1610775, at *22–24; *Jannus Group, Inc. v. Independent Container, Inc.,* No 98 Civ. 1075, 1999 WL 672550, at *1 (S.D.N.Y. Aug.25, 1999).

*Conclusion*

Because of the flaws in the selection of Dr. Dunbar's data sample, his expert report does not meet the *Daubert* standard. For the reasons set forth above, the defendants' motion to preclude Dr. Dunbar's testimony on issues relating to causation and liability is granted insofar as that testimony is based on the original data sample. Dr. Dunbar may, however, offer expert testimony to the extent that it is not dependent on the biased data. If the plaintiffs intend to offer such testimony, they shall submit a revised expert report within two weeks of the date of this Memorandum and Order.

SO ORDERED.